134 Wis.2d 108 (1986)
396 N.W.2d 156
STATE of Wisconsin, Plaintiff-Respondent,
v.
Jonas M. WASHINGTON, Defendant-Appellant-Petitioner.
No. 83-1804-CR.
Supreme Court of Wisconsin.
Argued February 27, 1985.
Submitted on briefs September 5, 1986.
Decided November 18, 1986.
*110 For the defendant-appellant-petitioner there were briefs by Ellen Pearlman and William J. Tyroler, assistant state public defenders, and oral argument by Mr. Tyroler.
For the plaintiff-respondent the cause was argued by Thomas J. Balistreri, assistant attorney general, *111 with whom on the briefs was Bronson C. La Follette, attorney general.
STEINMETZ, J.
There are two issues in this case:
(1) Was the defendant lawfully arrested after the police found evidence of a burglary on his person during a pat-down search for weapons?
(2) What are the limitations and ramifications of the inevitable discovery doctrine?
Defendant, Jonas M. Washington, was arrested for the burglary of Sedlar's Jewelry Store in Wauwatosa. Washington brought a motion to suppress certain evidence seized during the stop and arrest. The Honorable William J. Haese, in a Milwaukee county circuit court suppression hearing, held the arrest was legal and its fruits were legally seized and denied the motion. Washington waived his right to a jury trial, was tried to the court at his request and was convicted on the basis of police reports and the hearing testimony. He was sentenced to five years in prison.
On appeal of the conviction, the court of appeals held that, while the vehicle in which Washington was a passenger was legally stopped, the evidence was illegally seized. Nonetheless, the court of appeals reasoned the illegalities were cured under the doctrine of inevitable discovery.[1]
At about 1:13 on the morning of November 22, 1982, Wauwatosa Police Officer Howard Bacon heard a radio dispatch stating an intrusion alarm had been activated at Sedlar's Jewelry Store located at 8707 West North Avenue, Wauwatosa. Sedlar's Jewelry Store is *112 located at the foot of Pasadena Boulevard which runs north from a "T" intersection of West North Avenue and Pasadena Boulevard. Officer Bacon proceeded immediately to that location. As he neared the jewelry store, Bacon observed the silhouette of a station wagon in the westbound lane of West North Street turn north onto Pasadena Boulevard. There were no other vehicles or pedestrians in the vicinity at the time. Officer Bacon approached the jewelry store and as he stood next to the building he could see that the same station wagon, now about three-quarters of a block down Pasadena Boulevard, did not have its headlights on. The station wagon's lights finally went on as it neared the end of the block. Officer Bozicevich arrived at the scene and Bacon told him that he had observed a station wagon with no lights driving northbound on Pasadena Boulevard. Bozicevich broadcast this information over the radio.
At about 1:13 a.m., or moments after, Wauwatosa Officer Dennis Sengbusch also heard the radio dispatch that an intrusion alarm had been activated at Sedlar's Jewelry Store. Approximately two minutes later he saw a dark station wagon and an older, light-colored Chevrolet with a tail light out proceeding eastbound in the 8500 block of West Center Street, four blocks north of North Avenue. They were the only cars in the area. As Officer Sengbusch's marked squad car closed within fifty feet of the newer station wagon, it turned left on 84th Street. Sengbusch chose to follow the older vehicle, but noted the license number of the station wagon was NB 7126 or 2176 which he jotted down on a piece of paper.
As Officer Sengbusch approached the older Chevrolet still eastbound on West Center Street, he heard a broadcast by Officer Bozicevich that a Chevrolet station wagon had been seen in the vicinity of the burglarized *113 jewelry store. Officer Sengbusch turned around and tried to locate the station wagon he had just seen but was unable to find it. Sengbusch, however, notified the police dispatcher over the radio that he had seen a newer model, possibly a Chevrolet but definitely a General Motors type, station wagon with Wisconsin license plates NB 7126. The time was approximately 1:16 a.m. In the meantime, Officer Bacon observed that the front door of the jewelry store had been pried open and that a display case had been broken into.
A teletype was sent out by the Wauwatosa Police Department with the description of the suspected vehicle. The Milwaukee Police Department received that teletype and subsequently broadcast it to police patrols on the north side of the city of Milwaukee stating that a Chevrolet station wagon with Wisconsin license number NB 7126, or a variant of that, was wanted in connection with a jewelry burglary in Wauwatosa.
At about 1:20 a.m. Milwaukee Police Officer William Welter had just received that dispatch when he observed a station wagon with matching license plates eastbound in the 3300 block of West Center Street. Welter contacted his dispatcher to confirm the license plate number of the suspected vehicle. The numbers matched and at 29th and Center Streets, Welter pulled his squad car in behind the wagon while another squad car pulled alongside it.
Officer Welter ordered the two occupants of the wagon, one of whom was Washington, to get out. The defendant, Washington, was a passenger in the car and exited from the right side. Because Washington was suspected of a felony, Welter had Washington place his hands on top of the car and lean on it so he could be *114 patted down to determine whether he was carrying any weapons.
While frisking Washington, Officer Welter felt three watches in Washington's pocket and placed him under arrest. He removed the watches and noted they had tags identifying them as the property of Sedlar's Jewelers.
Washington does not allege that the initial search of his person went beyond his outer clothing. Officer Welter testified he "conducted a patdown for weapons" during the course of which he "felt several objects" which he said felt like three watches. This testimony differs from his statements at a second continued phase of the hearing when he said he saw them on the defendant's arms.
After the arrest, Officer Welter observed a jewelry case in the back seat of Washington's vehicle. It was plexiglass, about two feet long and contained a large number of necklaces.
After oral arguments and deliberations, this court found the testimony relating to the actual seizure ambiguous and therefore remanded the matter to the trial court with the following order:
"IT IS ORDERED that the record be remanded to the circuit court to reopen the hearing on defendant's motion to suppress evidence for further inquiry into the circumstances surrounding the seizure of the watches, giving both parties the opportunity to present their full evidence on the issue of the validity of the seizure of the watches and to file any additional briefs and to present any argument on this issue.
"IT IS FURTHER ORDERED that the hearing before the circuit court shall be held on or before June 12, 1985, and the circuit court shall, upon considering *115 the matters presented at the rehearing, rule on the motion to suppress on or before June 19, 1985, making such findings of fact and conclusions of law as necessary.
"IT IS FURTHER ORDERED that this court retains jurisdiction over the matter and the clerk of circuit court shall remand the record to this court after the circuit court completes the hearing, its reconsideration, and enters its order."[2]
The hearing was reopened and conducted by the Milwaukee county circuit court on June 11, 1985, with a decision rendered on June 14, 1985. However, due to the Milwaukee judicial district's plan of judicial rotation, the hearing pursuant to this court's order was conducted, not by Judge William Haese, but by the Honorable Laurence G. Gram, Jr.
Testifying at both the first and second hearing were Officer Welter and the defendant. Additional prosecutorial witnesses testified at the second hearing who had not testified at the first one. There were some differences in Officer Weblter's testimony between the first and second hearings but some of that difference may be accounted for in that this court's order directed there be evidence in greater depth at the second hearing.
The substance of Officer Welter's testimony at the two appearances was:
At the first hearing, Officer Welter stated he conducted a pat-down search and felt several objects on the defendant's person. He stated he specifically felt three watches on the defendant's person. He then placed the defendant under arrest for burglary. After placing the defendant under arrest, Welter stated he saw a jewelry *116 case containing necklaces on the back seat of the car in which the defendant was a passenger.
At the second phase of the hearing, Officer Welter stated that as he approached the defendant's stopped vehicle, he shined a flashlight beam in the rear to see if there were any passengers there. He saw no passenger; however, he did observe a large plexiglass container. He thought it to be "possibly something that was taken in the burglary of a jewelry store." However, he did not study it in detail at that time. Officer Welter then ordered the defendant out of the vehicle and patted him down. At that time, while having the defendant in the "spread eagle" position, Officer Welter stated he noticed the defendant had a watch on each wrist. Officer Welter stated that after the protective pat-down, defendant "was placed under arrest after further investigation into the rear seat." Further investigation involved opening the rear car door to see if the case that he had observed contained jewelry. It did contain necklaces and other jewelry. Finally, during a custodial search after arrest, he recovered a third watch from defendant's right jacket pocket that had a Serial number or a tag number of XXXXX-XXXXX with a Sedlar's Jewelry tag on it.
Officer Welter was not sure on this second testimony whether he conducted the pat-down search or whether his partner, Officer Weber, did but he, Welter, observed the watches on defendant's wrists.
The testimony of the defendant at the first hearing dealt mainly with how many officers were present at the scene when his car was stopped and whether the officers had shotguns, how many and at whom they were pointed. He admitted being frisked and that watches were found on his person and that he was then placed under arrest.
*117 At the second phase of the hearing, the defendant stated that when he was stopped he was wearing one wrist watch on his left wrist and two on his right forearm but had no watches in his pocket. He stated two of the watches were from the jewelry store. He claimed no watches were found on him when he was frisked and that no watches were found on him until he went to the paddywagon and as an officer was about to put cuffs on him, the watches were discovered. He stated he was then arrested.[3] Later, on cross-examination, the defendant stated he had one watch on his left arm and one on his right forearm and that both were stolen from Sedler's Jewelry.
At the second phase of the hearing, Officer Welter testified that part of the information he received over the police radio was that watches were taken in the Sedlar's Jewelry Store burglary.
Initially, on the close of testimony at the second phase, Judge Gram stated the defense motion to suppress should be granted. The judge found the testimony of Officer Welter different from his previous testimony at the first part of the hearing before Judge Haese. Judge Gram did not comment on the fact of the differences in defendant's testimony at each of the two phases of the hearing.
Later, on June 14, 1985, Judge Gram granted the motion to suppress but only for the watch found in defendant's pocket, not the watches on defendant's wrist because as Judge Gram stated: "because that they can just see." By this statement, it appears Judge Gram was considering Officer Welter's testimony at the second *118 phase of the hearing when he stated he saw watches on the defendant's wrists, not the first phase when Officer Welter stated he felt the watches. However, even defendant's counsel at the second phase of the hearing understood Officer Welter's testimony to be that he went into the pocket because at that point he was conducting a search incident to arrest. Judge Gram did not accept Officer Welter's testimony at the hearing before him, even though he referred to it, but rather, he accepted Welter's testimony before Judge Haese.[4]
Judge Gram did not make any finding, in fact he refused to make one, regarding the observations or discovery of the jewelry case in the car, since he did not believe this court's return order required it or allowed it.
In Terry v. Ohio, 392 U.S. 1, 21 (1968), the United States Supreme Court held that in order to justify "the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." The Sixth Circuit Court of Appeals in United States v. Hensley, 713 F. 2d 220 (6th Cir. 1983) applied a two-prong test to determine the legality of the police officer's warrantless stop. The United States Court of Appeals felt, one, the crime must be imminent or ongoing, and, two, the officer must have a reasonable suspicion that the suspect is involved in criminal activity. The court of appeals held a completed crime does not satisfy the first prong and a *119 wanted flyer is insufficient to create a reasonable suspicion.
On appeal the United States Supreme Court in United States v. Hensley, 467 U.S. 1203, 83 L. Ed. 2d 604 (1985), reviewed the court of appeals analysis of the first prong and cited United States v. Cortez, 449 U.S. 411, 417 n. 2 (1981), United States v. Place, 462 U.S. 696 (1983), Michigan v. Summers, 452 U.S. 692, 699 n. 7 (1981) and Florida v. Royer, 460 U.S. 491, 498 (1983) and stated at 83 L. Ed. 2d 611: "[T]hese dicta suggest that the police are not automatically shorn of authority to stop a suspect in the absence of probable cause merely because the criminal has completed his crime and escaped from the scene." The Supreme Court advised that the same test used to identify the proper bounds of intrusions which further the investigation of imminent or ongoing crimes should be used in the investigation of completed crimes.
In reviewing the second prong of the court of appeals' analysis, the Supreme Court stated: "It is enough to say that, if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion." 83 L. Ed. 2d at 612. The court further added at 613-14:
"[W]hen evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who issued the flyer possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance. In an era when criminal suspects *120 are increasingly mobile and increasingly likely to flee across jurisdictional boundaries, this rule is a matter of common sense: it minimizes the volume of information concerning suspects that must be transmitted to other jurisdictions and enables police in one jurisdiction to act promptly in reliance on information from another jurisdiction ....
"We conclude that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification,... to pose questions to the person, or to detain the person briefly while attempting to obtain further information."
Because Washington concedes he was lawfully stopped and frisked and that admission is bolstered by United States v. Hensley, the next question necessary to decide is whether the detection of the three watches combined with the prior knowledge of the burglary amounted to probable cause to believe the defendant committed the crime of burglary in order to permit the further search.
The state has the burden to prove that a warrantless search was conducted in compliance with the requirements of the Fourth Amendment. State v. Boggess, 115 Wis. 2d 443, 449, 340 N.W. 2d 516 (1983); Bies v. State, 76 Wis. 2d 457, 463, 251 N.W. 2d 461 (1977). It is well established that police may seize evidence in plain view without a warrant. Coolidge v. New Hampshire, 403 U.S. 443 (1971), Ball v. State, 57 Wis. 2d 653, 205 N.W. 2d 353 (1973). *121 [2] We described the plain view exceptions for seizure without a warrant and the criteria in Bies v. State, 76 Wis. 2d 457, 464, as follows:
"(1) The officer must have a prior justification for being in the position from which the `plain view' discovery was made;
"(2) The evidence must be in plain view of the discovering officer;
"(3) The discovery of the evidence must be inadvertent; and
"(4) The item seized, in itself or in itself with facts known to the officer at the time of the seizure, provides probable cause to believe there is a connection between the evidence and criminal activity." [3] In this case, the four criteria stated in Bies were complied with. As to the first requirement, Officer Welter was justified in patting down Washington. When a police officer believes that a suspect he has stopped may be armed and dangerous, the officer "`is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of [the suspect] in an attempt to discover weapons which might be used to assault him.'" State v. Williamson, 113 Wis. 2d 389, 400-01, 335 N.W. 2d 814 (1983), quoting Terry v. Ohio, 392 U.S. at 30. [4] The second requirement that the evidence be in plain view is fulfilled by the fact that the watches were exposed to the officer's sense of touch or view. Evidence in plain view is not restricted to items which can only be seen, but rather includes the realization of items or events to all of the human senses, smell, sight, touch, *122 hearing and taste. Because Officer Welter stated he felt the three watches by his sense of touch, he was`able to determine what they were and as such, they were in "plain view." This was the testimony accepted by Judge Gram from Welter's first testimony. In his later testimony he saw two watches on defendant's arms and found one in defendant's pocket.
As to the third and fourth requirements, Officer Welter inadvertently discovered the watches while conducting a pat-down for weapons and the combination of the three seized watches and the fact that the officer knew about the burglary provided probable cause to believe there was a connection between the evidence and criminal activity. Professor LaFave in 3 W. LaFave, Search and Seizure, sec. 9.4, 1984 Supp. at 66 (1978), states:
"Assuming the object discovered in the pat-down does not feel like a weapon, this only means that a further search may not be justified under a Terry analysis. There remains the possibility that the feel of the object, together with other suspicious circumstances, will amount to probable cause that the object is contraband or some other items subject to seizure, in which case there`may be a further search based upon that probable cause."
Since Terry, the word "pat-down" has become a term of art in the legal profession. It is clearly understood, along with its synonym "frisk" to mean "a careful exploration of the outer surfaces of a person's clothing all over his or her body."[5]Terry 392 U.S. at 16. Because *123 a search is for the protection of the police and others nearby, it must be confined in scope to an intrusion reasonably designed to discover instruments which could be used to assault the officer. Id. at 29. Though a pat-down provides no justification to search for evidence of a crime, it does not mean that the police must ignore evidence of a crime which is inadvertently discovered.
It is unusual for an individual to have three watches on his person. That fact combined with the fact that the officer knew the station wagon in which the defendant was a passenger was involved in a jewelry store burglary gave rise to probable cause that the defendant was implicated in the burglary. Watches are items often taken in burglaries, especially burglaries of jewelry stores. When Officer Welter felt or saw the watches he knew that Washington was suspected of committing a burglary. Officer Welter had probable cause to believe that the watches Washington possessed were the fruits of his crime and hence evidence of the Wauwatosa burglary. Thus, Officer Welter was justified in reaching under the outer layer of Washington's clothing, not to see what was there, he already knew there were watches there, but to seize the evidence.
When Officer Welter removed the watches from Washington's person he found they still had tags identifying them as the property of Sedlar's Jewelers. Officer Welter had probable cause to arrest Washington and seize the watches.
Once Washington had been arrested, the police had a right to search the passenger compartment of his station *124 wagon and any containers in that area. The display case containing the necklaces was in plain view in the back seat of the station wagon; Washington was under arrest and the police could search the wagon and retrieve the display case as evidence.
If Officer Welter's first testimony is accepted, as was done by Judge Gram, then the evidence is that Welter felt three watches on the defendant's person, immediately placed him under arrest and then confiscated the jewelry case in the automobile, which was proper under State v. Fry, 131 Wis. 2d 153, 388 N.W. 2d 565 (1986). The watches were discovered in a pat-down search and therefore all of the evidence is properly admissible and the motion to suppress should be denied.
If Officer Welter's testimony at the second phase of the hearing, when remanded by this court for that purpose, is accepted, then he conducted a pat-down search and noticed a watch on each of defendant's wrists and placed the defendant under arrest after opening the car door and looking at the contents of the jewelry case he had observed on the rear seat when he initially checked the car for additional passengers. He observed it contained necklaces and other jewelry. Officer Welter had probable cause for the arrest before he examined the jewelry case in the car. In fact, the defendant believed he was under arrest as the officers approached the car with shotguns bared. Arrest is a state of mind of the defendant and does not require the magic words "you're under arrest" to be pronounced.
Under Wisconsin law, three elements are necessary to conclude a person is under arrest: "`(1) his ability or freedom of movement is restricted, (2) the arresting officer intends, at that time, to restrain the person, and *125 (3) the person under arrest believes or understands he is in custody.'" State v. Goebel, 103 Wis. 2d 203, 213, 307 N.W.2d 915 (1981) quoting State v. Doyle, 96 Wis. 2d 272, 282, 291 N.W.2d 545 (1980); Huebner v. State, 33 Wis. 2d 505, 147 N.W.2d 646 (1967). Washington believed he was in custody as soon as the vehicle stopped and he saw the shotguns. His movement was restricted by the police vehicles and the show of weapons. After finding the watches on Washington's person, Officer Welter testified that he placed Washington under arrest. Since Welter had sufficient probable cause to place Washington in custody at that point, any statement to Washington that "you're under arrest" would be immaterial to a finding of arrest. The three elements were satisfied when the watches on Washington's wrists were found, and Washington was then under arrest. The totality of these circumstances gave rise to the existence of the intent to arrest the defendant in Welter's mind, whether he verbally expressed it or not. The jewelry case is therefore not properly subject to the motion to suppress.
Though there may be some confusion in Officer Welter's testimony between the two hearing phases, the motion to suppress should be denied under either circumstance described as to all of the confiscated evidence. Judge Gram analyzed Officer Welter's testimony on the remand by this court as follows:
"And I don't think anybody is perjuring themselves. I think they have been put in a very compromising situation where they have almost been forced to review their testimony in the light of trying to produce a certain result...."
*126 There is confusion in the case, but if we accept the officer's first testimony, as Judge Gram did, the arrest was made after the pat-down. Judge Gram stated:
"[T]his Court is considering the officer's testimony frozen as what it was the first time around as far as thatwhether there was one search or two searches. It's this Court's finding that there was one search, that was a search pursuant to the statute, and that pat-down search was one that was limited for weapons as the Supreme Court had indicated in their discussions."
The three watches were found by Officer Welter feeling them on that search according to his first testimony.
The arrest of the defendant and the seizure of the physical evidence of his guilt were in complete compliance with the requirements of the fourth amendment. Under the facts of this case, a discussion of the theory of inevitable discovery, an issue raised by the parties and relied on by the court of appeals, would be dicta. We wait for another case in which the doctrine of inevitable discovery is a controlling issue before we rule on its requirements and respective limits.
We affirm the decision of the court of appeals but on different grounds than relied on by the court of appeals.
By the Court.The decision of the court of appeals is affirmed.
LOUIS J. CECI, J. (concurring).
As is evident by the facts as set forth in the majority's opinion, this case is replete with confusion. The confusion that exists in this case can be directly traced to this court's order mandating that the Milwaukee judicial district adhere to a plan calling for the rotation of judicial duties. As a *127 result of this rotation system, the court-ordered hearing was not conducted by the judge who had heard the original suppression motion and who had previously listened to the testimony of some of the same witnesses who were called upon to testify at the second hearing. This is contrary to common sense. It seems to me that when a case is remanded for an additional hearing, this court should order that the original judge who presided over the matter be called upon to conduct the rehearing. This procedure is more logical, would foster court efficiency, and, most importantly, might eliminate the type of confusion that is evidently present here.
SHIRLEY S. ABRAHAMSON, J. (dissenting).
After very good police work in capturing a burglary suspect, the judicial process has unfortunately produced a managled record that cannot justify admitting into evidence all items the police seized from the defendant.
This is not the proverbial case that raises the cry that the criminal goes free because the constable has committed a technical blunder. This is a case in which many blundered, and the blunders are not mere technicalities. Regardless of the court's decision on the suppression of evidence, the defendant does not go free. The defendant has already, or nearly, finished serving a five-year prison sentence for this crime. If some of the evidence is suppressed, as Circuit Court Judge Gram, the court of appeals, and I say it should be, and if there is a new trial (which is unlikely), enough evidence remains to convict.
In this case:
A police officer has testified at two proceedings to two different versions of the search of the defendant and the seizure of items.
*128 The circuit court (Judge Gram presiding) initially stated one finding of fact and then finally adopted another.
The majority opinion adopts two (and perhaps three or four) alternate versions of the facts, all versions differing from the facts finally adopted by the circuit court.
The majority opinion contravenes a prior order this court issued in this case.
Upon concluding that the police officer's testimony at the first hearing was inadequate to support the admissibility of the evidence seized, this court ordered a second hearing. After conducting this second hearing, the circuit court made findings accepting certain parts of the officer's testimony at the first hearing and other parts of the testimony at the second hearing.
Instead of applying the law to the facts as found by the circuit court, the majority says that on the basis of the officer's testimony at either hearing, no evidence should be suppressed. In so holding, the majority ignores not only the findings of the circuit court, but also this court's order of May 17, 1985, in which we concluded that the officer's testimony at the first hearing was inadequate to justify a suppression order.
Because I conclude that the majority has ignored the circuit court's findings of fact and an order of this court, I cannot join the opinion. I would affirm the circuit court's decision to admit two watches and suppress one watch.

I. I turn first to that part of the majority opinion that apparently accepts as fact the officer's testimony at the *129 first hearing that the officer "felt" three watches in the defendant's pockets on a Terry stop pat-down for weapons and that after the pat-down, and after the officer removed the watches from the defendant's clothing to observe the jewelry store tags, the defendant was arrested.[1]
*130 The majority mistakenly concludes that the circuit court accepted the officer's testimony at the first hearing. At 9, note 4, and at 13, 17.
On June 11, the circuit court said it was assigning "greater credibility to the officer's testimony given the first time around than the second time around." On June 14, however, the circuit court reconsidered the officer's testimony at the first hearing and concluded that it believed part of the officer's first testimony and part of the officer's second testimony. The majority fails to describe the circuit court's findings and rulings at the June 14 proceeding.
On June 14 the circuit court stated that it believed the police officer's first testimony that all three watches were found in a single protective search of the defendant (a pat-down for weapons) and further believed the police officer's second testimony that two of the watches came into plain view when the defendant extended his arms for the pat-down. Thus the circuit court made the following findings of fact: two watches were in plain view on the defendant's wrists during the pat-down and the third watch was found in the defendant's pocket on the pat-down before an arrest. See Record 17 at 3, 4, 5, 6, 9. In keeping with this finding the circuit court allowed into evidence the two watches found on the wrists (plain view) and suppressed the third watch *131 found in the pocket, concluding that the seizure of the third watch exceeded the scope of a pat-down search.[2]
Had the circuit court accepted, as the majority contends, the first testimony that the officer "felt" all three *132 watches in the defendant's pocket on the pat-down, at 5, 14, the circuit court would have treated all three watches in the same wayeither suppressed them all or admitted them all. The circuit court treated the watches differently because it did not accept the officer's testimony at the first hearing in toto.
My statement of the circuit court's factual findings at the June 14 proceedings coincides with the statement of both the state and the defendant. See state's supplemental brief, p. 7; defendant's supplemental brief, pp. 8-9. The circuit court, to use the state's phrase, made a "determination of selective credibility," Supplemental brief, p. 8, note 4, as the circuit court had every right to do.[3] This court, as the state's brief correctly recognizes, is bound by the circuit court's findings of fact, unless we can declare the findings clearly erroneous. We cannot make such a declaration in this case.[4]
Because the majority's first alternative version of the facts conflicts with the circuit court's final findings of fact, I cannot join the majority.
Even if I were to accept the facts developed at the first hearing and accepted by the majority, I could not *133 accept the majority's holding that the seizure of the watches is constitutional. At 11, 12, 13, 15.
The majority reasons that the officer could seize the three watches because the officer could determine by pat and feel (plain view by touch) that the objects in the pocket were stolen watches. This reasoning and the majority's holding contradict this court's order of May 17, 1985 in which the court stated that the officer's testimony at the first hearing was "ambiguous" and that "a decision regarding the legality of the seizure of the watches and therefore the legality of the arrest cannot be reached fairly on the basis of the present record...." Order, p. 5. The majority gives no reason or explanation for contradicting this court's prior order.
The majority might be able to rely on its pat-and-feel plain-view-by-touch test if additional evidence had been presented at the second hearing to supplement that given at the first hearing. The officer's testimony of the second hearing, however, adds nothing to indicate that he discovered any of the watches by sense of feel. The one watch found in the defendant's clothing was, according to the officer's second testimony, "recovered ... from [the defendant's] right jacket pocket... during a custodial search." (Emphasis added.)
The circuit court correctly noted that accepting the officer's testimony at the first hearing "leaves us in a situation where many of the questions that the Supreme Court posed [in its May 17 order] have not been responded to." I conclude, as did Judge Gram, the court of appeals and this court in its May 17 order, that the testimony at the first hearing does not justify a finding that the officer could identify a watch on a protective pat-down by feeling an object though the defendant's clothing.

*134 II.
I now turn to that part of the majority opinion that apparently accepts as fact the officer's testimony at the second hearing that the officer saw two watches on the defendant's wrists at the pat-down and then found the third watch in the defendant's pocket during a custodial search after the defendant was arrested. At 7, 15, 16.
If these were the facts found by the circuit court, I would agree with the majority that all three watches were admissible. But this version of the facts contravenes the circuit court's findings of June 14. As I explained previously, the circuit court never fully accepted all of the officer's testimony at the second hearing. The circuit court found that the officer discovered all three watches at the pat-down before arrest; two watches were on the defendant's arms, the third watch was in the defendant's pocket. I believe this court is bound by the circuit court's findings of fact.

III. The question remains what the court should do with this case on this record.
The defendant has expressed dissatisfaction with the circuit court's determination of selective credibility and the confusion evident in the record and in the circuit court's "two" findings. He urges this court to adopt the June 11 finding of the circuit court and conclude, as we did in our May order, that the state did not bear its burden of proving that the seizures complied with constitutional requirements. I am not persuaded this is the correct course. *135 The state has also expressed dissatisfaction with the circuit court's determination of selective credibility, but concludes correctly, in my opinion, that "we are bound by the findings of the lower court." State's supplemental brief, p. 8, note 4.
On the basis of the circuit court's findings, which I think this court must accept, I would affirm the circuit court's decision that the two watches on the defendant's arms are admissible and the third is not.
I would also suppress the jewelry case. The police officer gave different testimony at the two hearings regarding the seizure of the case, the defendant gave his version of the seizure of the case, and the circuit court made no findings of fact. I do not reach the issue of inevitable discovery because of the conflicting testimony, the circuit court's failure to make findings of fact, and the state's seeming reliance on a plain-view-search-incident-to-arrest theory and not inevitable discovery. For the reasons set forth, I dissent.
I am authorized to state that CHIEF JUSTICE NATHAN S. HEFFERNAN joins this dissent.
NOTES
[1] State v. Washington, 120 Wis. 2d 654, 358 N.W.2d 304 (Ct. App. 1984).
[2] Supreme court order dated May 17, 1985. (Steinmetz, J., dissenting.)
[3] At the first appearance, the defendant stated he thought he was under arrest when his vehicle was stopped and he saw officers with shotguns pointed at the car and him.
[4] Judge Gram stated: "That's what he [Welter] said this time. I agree but that's not what he said the first time and in effect what I'm holding the officer to is the testimony the first time that said that it was a search during temporary questioning." Also, Judge Gram stated: "I think that I have to give greater credibility to the testimony given the first time around than the second time around."
[5] See also, Ybarra v. Illinois, 444 U.S. 85, 92-93 (1979); State v. Williamson, 113 Wis. 2d 389, 399-400; State v. Williamson, 58 Wis. 2d 514, 519-20, 206 N.W. 2d 613 (1973); State v. Chambers, 55 Wis. 2d 289, 294-95, 198 N.W. 2d 377 (1972).
[1] The majority describes the officer's testimony at the first proceeding differently at different places. Sometimes the majority says the officer felt watches, placed the defendant under arrest and then removed the watches from the defendant's person. At 5. Other times the majority says the officer felt watches, removed them from the pocket and observed the jewelry tags and then arrested the defendant. At 15. Still other times the majority says the officer saw or felt the watches. At 14. At 17, where the majority concludes the officer felt three watches. Although the officer's first testimony is ambiguous which is why we remanded for a second hearingthe officer expressly testified he felt three watches.

The officer's entire direct (and relevant) testimony at the first hearing relating to frisking the defendant and finding the watches is as follows:
"Mr. Blinka [of the district attorney's office]:
"Q. What side of the car did he get out of?
"A. The passenger side.
"Q. What did you do then?
"A. I conducted a patdown for weapons for my own protection and the protection of suspect and other persons in the area since there were felony suspects and during the patdown I observed or I felt several objects.
"Mr. Foust [defense counsel]: I will stipulate that was felt and what was found in the car came to be evidence in this case.
"Mr. Blinka:
"Q. Specifically, what did you feel?
"A. I felt watches.
"Q. How many watches?
"A. 3.
"Q. Did these watches have any other distinguishing characteristics about them?
"A. Yes. They had tag numbers and the name of the Stedlar's, I think it was Stedlar's Jewelry.
"Q. What did you do after finding these items?
"A. Placed the subject under arrest for burglary.
"Q. Had you placed Mr. Washington under arrest for burglary prior to that time?
"A. At that time he was only a suspect. I didn't arrest him."
[2] On June 14 Judge Gram ruled on the testimony and evidence as follows:

"The Court: We talked about all of the watches. Now, he had some watches on his wrist ... which I think are a little different than watches in his pockets ... Okay, the motion to suppress is granted, but for those things that were seized as a result of exceeding the type of search that's authorized under the statute. Now, that would be for property that's in the pockets, not something that's on the wrist, because that they can just see ... I came to the conclusion on the testimony that I heard, what we had was a search underwell, what is that section of the statutes968.25. That was the conclusion that I came to, and that limits it to a search for weapons. And I felt that anything found in the pockets went beyond the scope of a search for weapons in terms of watches ... Now, as I understand it, there were three watches seized as a result of that search. Two of which had nothing to do with the search in the judgment of this Court because they were clearly exposed on the arms and apparently there was one watch in a pocket. It's the watch in the pocket that the Court is suppressing....
"Defense Counsel: ... Now, if I understand the Court correctly, the Court said it would accept his [the police officer's]first hearing testimony in preference to the more recent testimony. Am I right in that regard?
"The Court: I said that, but I said it in relation to a particular situation, and that particular situation was the first time he testified in effect that he was making a Terry-type search. This time he testified that first he made the Terry-type search, then he determined what was in the car, then he placed him under arrest, and then he made a second search pursuant to a lawful arrest. And I guess really what I said is that the officerthis Court is considering the officer's testimony frozen as what it was the first time around as far as thatwhether there was one search or two searches. It's this Court's finding that there was one search, that was a search pursuant to the statute, and that search was one that was limited for weapons as the Supreme Court had indicated in their discussions." Record 17 at 3, 4, 9, 10, 11.
[3] This court has said many times that the circuit court determines credibility and can select the testimony it chooses to believe. State v. Prober, 98 Wis. 2d 345, 359, 297 N.W. 2d 1 (1980); Kohlhoff v. State, 85 Wis. 2d 148, 154, 270 N.W. 2d 63 (1978); Nabbefeld v. State, 83 Wis. 2d 515, 266 N.W. 2d 292 (1978).
[4] A cardinal rule is that an appellate court cannot make findings of fact on conflicting testimony and that an appellate court must accept the circuit court's findings of fact unless the circuit court's findings are clearly erroneous. The majority cannot declare the circuit court's findings clearly erroneous because the record in this case poses a question of the witnesses' credibility, and the circuit court, not this court, judges credibility.