STATE of Wisconsin, Plaintiff-Respondent-Petitioner

v.

Robin H. GUY, Defendant-Appellant.

Supreme Court

*No. 91–0708–CR. Oral argument September 3, 1992.—Decided December 9, 1992.*

(Also reported in 492 N.W.2d 311.)

For the plaintiff-respondent-petitioner the cause was argued by *Stephen W. Kleinmaier,* assistant attorney general with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Elizabeth E. Stephens,* assistant state public defender.

LOUIS J. CECI, J.   This case is before the court on petition for review of a published decision of the court of appeals, *State v. Guy,* 165 Wis. 2d 333, 477 N.W.2d 349 (Ct. App. 1991), which reversed a judgment of the circuit court for Milwaukee County, Michael J. Skwierawski, Circuit Judge. The circuit court denied Robin H. Guy's (the defendant) motion to suppress cocaine that police had found in her pants pocket and subsequently convicted her of possession of cocaine with

intent to deliver, in violation of secs. 161.16(2)(b)1 and 161.41(1m)(c)1, Stats.

The first question this case presents is whether the Milwaukee police, while executing a warrant authorizing them to search for cocaine and drug-related items in a private residence, constitutionally frisked the defendant. The second question is, assuming the frisk was constitutional, did the police then constitutionally seize cocaine when, upon feeling something soft in the defendant's front pants pocket during the frisk, an officer reached into that pocket and pulled out a baggie containing cocaine. We hold that both the frisk and the ensuing seizure were constitutional and, therefore, reverse the decision of the court of appeals.

On August 23, 1990, Detective James Boyd obtained a warrant to search a single-family home in Milwaukee. An anonymous police informant supplied the information supporting the warrant after making a controlled purchase of cocaine from a male at the home. The warrant authorized a search for

> cocaine, scales, packaging material, records of drug transactions, monies and/or fruits of the crimes, letters and/or utility bills and keys which would help to identify the person in control of the premises. Also, person of 'John Doe' b/m 31, 5'9", 145 #.

The next day, approximately ten to fifteen Milwaukee police officers executed the search warrant. The defendant sat in the living room of the home, watching television, when two officers entered with weapons drawn. The officers guided the defendant to the front porch where they handcuffed her. The police also brought the defendant's mother, cousin, and brother out to the porch and handcuffed them. The officers had

already handcuffed the defendant's mother's boyfriend, who had been on the porch when police arrived.

An officer then ordered Officer Constance Zarse to frisk the defendant. (Milwaukee police procedure calls for female officers to frisk female suspects when possible.) Officer Zarse patted down the defendant's body. When Zarse felt a soft bulge in the defendant's front pants pocket, she asked the defendant what it was. The defendant said, "Find out for yourself." Zarse reached into the defendant's pocket and pulled out a baggie containing eleven paper "bindles." Those eleven bindles contained a total of 1.66 grams of cocaine. The defendant was charged with possessing cocaine with intent to deliver, in violation of secs. 161.16(2)(b)1 and 161.41(1m)(c)1, Stats.

The defendant moved to suppress the cocaine, arguing that the police had illegally searched her. At the suppression hearing, Officer Zarse said the police had escorted the defendant out to the porch so that the police could search the living room for weapons. Zarse stated that as she approached the defendant, the defendant stood motionless and did not appear to be armed. Zarse said she frisked the defendant for "contraband and weapons." She testified that as she frisked the defendant, she felt a soft bulge in the defendant's left front pants pocket. To Zarse, the bulge "[f]elt like it was drugs. It felt like a bag of—of possibly cocaine or marijuana."

Zarse testified that at the time she frisked the defendant, she had participated in about 300 drug investigations and about 150 search warrant executions. Zarse said that while executing those 150 search warrants, she had found evidence of either possession or possession with intent about 100 times. According to Zarse, a razor blade is the type of thing she searched for while executing a search warrant for drugs. She explained that she

was familiar with the use of razor blades in cocaine trafficking and that a person could hide razor blades on her person and use them as a weapon.

Detective James Boyd also testified at the hearing. Boyd said he had obtained the warrant in this case and was present when the police executed it. Boyd testified he had executed between 300 and 400 search warrants for drugs. According to Boyd, he had found weapons in "most" of those cases.

Boyd explained that in this case officers brought everyone out onto the porch because the police department has a policy of gathering everyone on the premises in one central place while executing a drug warrant. This policy's goals are: (1) to prevent those present during the execution of a drug warrant from exchanging information, passing drugs, and destroying evidence; and (2) to allow the police to search those present and the premises for weapons. According to Boyd, the police department also has a policy of searching everyone on the premises for weapons while executing a search warrant for cocaine. If cocaine is found, police search everyone on the premises for cocaine as well.

The trial court denied the defendant's motion to suppress. The court found the frisk was a reasonable one for weapons. The court went on to conclude that once Officer Zarse felt the bulge, she had probable cause to reach into the defendant's pocket and seize the cocaine. After the court denied her motion to suppress, the defendant pleaded guilty.

The court of appeals reversed because it concluded the officers did not have a reasonable suspicion that the defendant was armed. *Guy,* 165 Wis. 2d at 348. In a footnote, the court of appeals said, "If Zarse's frisk of Guy was lawful, the subsequent search would be lawful as

well since Zarse felt something that she believed was either cocaine or marijuana." *Id.* at 337 n.3.

The defendant challenges the search and seizure under both the United States and Wisconsin Constitutions. Whether searches and seizures pass constitutional muster is a question of law, which this court reviews without deference to the lower courts. *State v. Guzman,* 166 Wis. 2d 577, 586, 480 N.W.2d 446 (1992). We may interpret art. I, sec. 11 of the Wisconsin Constitution differently than the United States Supreme Court interprets the Fourth Amendment to the United States Constitution. *Id.* However, we conform Wisconsin's law of search and seizure to the law of search and seizure developed by the Supreme Court—in part because the text of the two provisions is identical in all important respects and in part to avoid the confusion different standards could cause. *Id.* at 586–87.

Did Officer Zarse constitutionally frisk the defendant? A frisk is a search. *Terry v. Ohio,* 392 U.S. 1, 16–17 (1968). The fourth amendment does not proscribe all searches, only unreasonable searches. *Id.* at 9. In order to determine whether a search is reasonable, we balance the need for the search against the invasion the search entails. *Id.* at 21.

In *Terry,* the Court applied this balancing test to determine the legality of an on-the-street frisk of a person suspected of casing a robbery location. The Court first considered the need for the search, emphasizing the need for police to protect themselves from violence:

> [T]here is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a

> weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.

*Id.* at 23. The Court then balanced the need for police protection against the intrusion on individual rights which a frisk entails. Although the Court viewed a frisk as "a severe, though brief, intrusion upon cherished personal security" and an "annoying, frightening, and perhaps humiliating experience[,]" *Id.* at 24–25, the Court held that when an officer has a reasonable suspicion that a suspect may be armed, the officer can frisk the suspect for weapons. *Id.* at 30.

■ The facts of each case determine the reasonableness of a frisk, *Id.,* and we judge those facts against an objective standard. *Id.* at 21.

> The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Id.* at 27 (citations and footnote omitted).

In the years since the Court decided *Terry,* the Court has applied the *Terry* standard to different facts. The constant refrain in these cases has been that the

need for police to protect themselves can justify a limited frisk for weapons. *See, e.g., Maryland v. Buie,* 494 U.S. 325, 333 (1990) (Officers have an interest in self-protection which can justify a protective sweep.); *Michigan v. Long,* 463 U.S. 1032, 1049 (1983) ("Our past cases indicate . . . that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger . . .."); *Pennsylvania v. Mimms,* 434 U.S. 106, 111 (1977) ("What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety."); *Adams v. Williams,* 407 U.S. 143, 146 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . ..").

The parties agree that the *Terry* rule controls the frisk issue: an officer must have a reasonable suspicion—less than probable cause, but more than a hunch—that someone is armed before frisking that person for weapons. They disagree on the application of this rule to the facts of this case.

The state argues that Officer Zarse had a reasonable suspicion that the defendant was armed because (1) the police found the defendant in a residence while executing a search warrant for drugs and drug-related items; (2) weapons are the tools of the drug trade; and (3) Detective Boyd had found weapons in most cases while executing search warrants for drugs. The state relies heavily on decisions from other states that have allowed frisks under like facts. *See People v. Thurman,* 209 Cal. App. 3d 817, 257 Cal. Rptr. 517 (1989); *State v. Harris,* 95 N.C. App. 691, 384 S.E.2d 50 (1989); *State v. Zearley,* 444 N.W.2d 353 (N.D. 1989); *State v. Alamont,* 577 A.2d 665 (R.I. 1990).

95

Officer Zarse frisked the defendant while Zarse was executing a search warrant for cocaine. "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence . . .." *Michigan v. Summers,* 452 U.S. 692, 702 (1981). A magistrate had found probable cause to believe that cocaine trafficking was taking place in the residence in which officers found the defendant. Officer Zarse knew this. She also knew that occupants of the house had been brought out to the porch so the premises could be searched for weapons. She was aware that even though the defendant did not appear to be armed, she had been ordered to frisk her. Zarse knew that if the defendant was not arrested she would eventually be released from the handcuffs. Zarse had also executed about 150 search warrants for drugs. Officers can draw reasonable inferences from the facts in light of their experience. *Terry,* 392 U.S. at 27; *see also Harris,* 95 N.C. App. at 697, 384 S.E.2d at 53. A reasonably prudent officer in Zarse's position would be justified in believing her safety was in danger.

One of the reasons this belief would be reasonable is that weapons are often "tools of the trade" for drug dealers. *See, e.g., United States v. Oates,* 560 F.2d 45, 62 (2d Cir. 1977). This court has recognized that "[t]he violence associated with drug trafficking today places law enforcement officers in extreme danger." *State v. Williams,* 168 Wis. 2d 970, 984, 485 N.W.2d 42 (1992); *see also State v. Richardson,* 156 Wis. 2d 128, 144, 456 N.W.2d 830 (1990) ("Several cases have found that drug dealers and weapons go hand in hand, thus warranting a *Terry* frisk for weapons."). We can assume Officer Zarse knew that those who deal drugs often keep weapons on their person or nearby. She testified that when she exe-

cuted a drug warrant, the things she normally searched for included razor blades, which suspects could use as weapons.

Moreover, since *Terry,* the need for police to protect themselves has grown more urgent. In 1966, when the Court decided *Terry,* "there were 23,851 assaults on police officers," and 57 officers were killed in the line of duty. *Terry,* 392 U.S. at 24 n.21. By 1990, the number of assaults on police had nearly tripled. In 1990, there were nearly 72,000 assaults on police officers, and 65 officers were feloniously killed. Department of Justice, Federal Bureau of Investigation, *Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted (1990)* at 41 (1991); Mitchell Lampson, *On the Silver Anniversary of Terry v. Ohio: The Reasonableness of an Automatic Frisk,* 28 Crim. L. Bull. 336, 349 n.67 (July-Aug. 1992). In Wisconsin, in 1991, 1,002 officers were assaulted, and two were feloniously killed. Wisconsin Office of Justice Assistance, Statistical Analysis Center, *Crime and Arrests 1991* at 95.

The state argues that in analyzing whether Zarse had a reasonable suspicion, we can impute knowledge within the collective mind of the police force, including Detective Boyd's experience, to Zarse. We leave that argument for another day because even without considering information within the collective mind of the police force, the facts known to Zarse at the time of the frisk and the reasonable inferences she could draw from those facts would justify a reasonable officer in suspecting that the defendant was armed.

Nevertheless, the defendant argues that under *Ybarra v. Illinois,* 444 U.S. 85 (1979), Officer Zarse could not frisk her simply because she was on the premises where a drug warrant was being executed. In *Ybarra,* the Court addressed the frisk of a tavern patron for drugs.

97

The police had a warrant authorizing the search of a tavern and bartender for narcotics. *Ybarra,* 444 U.S. at 88. Police frisked a patron of the bar and found heroin. *Id.* at 88–89. The Court held that the frisk of the patron was unconstitutional, saying that the " 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." *Id.* at 94. The Court noted that *Terry* does not allow a "generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." *Id.* at 93–94. The defendant contends that her frisk was the type of generalized cursory search which *Ybarra* condemned.

The defendant's argument does not persuade us. The frisk in *Ybarra* took place in a public tavern where people came and went and legally conducted business. Officer Zarse did not arbitrarily decide to frisk the defendant on the street or in a public place. Zarse came upon the defendant in a home where an informant had previously purchased drugs, a home that a magistrate had found probable cause to believe was the site of drug dealing. When a magistrate has determined that a residence is the probable site of drug trafficking, the occupants of that residence are "very likely" to be involved in drug trafficking, *Thurman,* 209 Cal. App. 3d at 824, 257 Cal. Rptr. at 520–21. And, as we have noted, those involved in drug dealing often keep weapons handy.

Additionally, executing a search warrant in a home can be more dangerous than doing so in a public place. In a home, an officer has to deal with suspects on the suspects' own turf and can reasonably fear that persons found in the residence are presently armed or may have ready access to weapons. *Thurman,* 209 Cal. App. 3d at

98

824–25, 257 Cal. Rptr. at 520–21; *cf. Buie*, 494 U.S. at 333.

The defendant notes that some courts take the seriousness of the suspected drug offense into account when determining whether grounds for a *Terry* frisk exist. The defendant does not necessarily accept this approach, but argues that even if this approach is valid, "there was no suspicion and certainly no evidence of major drug dealing" in this case. Although some cases do distinguish between major and insignificant drug dealers, *see, e.g., Williams*, 168 Wis. 2d at 986 (evidence of a "significant amount of illegal drugs" required to justify a no-knock entry); *State v. Thomas*, 110 N.J. 673, 684, 542 A.2d 912, 918 (1988), we find it inappropriate to do so in this case. Police must be able to react flexibly when executing a search warrant. *See generally Ybarra*, 444 U.S. at 105 (Rehnquist, J., dissenting). To require police to distinguish between major and insignificant dealers or users before making a limited frisk for weapons would be impractical and could unreasonably put officers in danger. Officer Zarse knew there was enough evidence of drug dealing within the residence to justify the issuance of a search warrant. That knowledge is one factor we consider important in analyzing Zarse's frisk of the defendant, regardless of whether the police suspected that "major" drug dealing was taking place in the residence.

A reasonably prudent officer with Zarse's experience and knowledge at the time of the frisk would be justified in suspecting that the defendant may have been armed. We hold that Zarse had a reasonable suspicion that the defendant may have been armed. Put another way, after balancing the intrusion that the frisk must have caused against the need for protecting Zarse's safety while she

executed a search warrant for drugs in a private residence, we hold that the frisk was reasonable.

This holding does not place a constitutional imprimatur on the Milwaukee Police Department's policy of automatically frisking everyone present for weapons while executing a search warrant for drugs in a private residence. The constitutionality of each such frisk will continue to depend upon its facts. *Terry,* 392 U.S. at 30.

Having concluded that Officer Zarse constitutionally frisked the defendant, we now turn to the subsequent seizure of the cocaine. After feeling a soft bulge that felt like it could have been cocaine or marijuana, Officer Zarse put her hand into the defendant's pocket and pulled out the baggie containing cocaine. The scope of a *Terry* search must be limited to a pat-down "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry,* 392 U.S. at 29. Consequently, because what Zarse felt did not feel like a weapon, she exceeded the lawful scope of a *Terry* search when she reached into the defendant's pocket. However,

> [a]ssuming the object discovered in the pat-down does not feel like a weapon, this only means that a further search may not be justified under a *Terry* analysis. There remains the possibility that the feel of the object, together with other suspicious circumstances, will amount to probable cause that the object is contraband or some other items subject to seizure, in which case there may be a further search based upon that probable cause.

*State v. Washington,* 134 Wis. 2d 108, 122, 396 N.W.2d 156 (1986) (citation omitted).

The state argues that the plain-touch corollary to the plain-view doctrine justified Zarse's reaching into the defendant's pocket and pulling out the baggie. Evidence in plain view includes evidence an officer recognizes through any of her senses. *Washington,* 134 Wis. 2d at 121–22. A person has no reasonable expectation of privacy in an item that is in plain view. *Horton v. California,* 496 U.S. 128, 133 (1990). Therefore, no search occurs when an officer views or feels evidence that is in plain view; and the plain-view doctrine addresses the validity of seizures. *Id.*

In *Horton,* the Supreme Court revised the plain-view doctrine, eliminating the inadvertence element. *Id.* at 137. We find the reasoning in *Horton* persuasive, *see id.; U.S. v. Cardona-Rivera,* 904 F.2d 1149 (7th Cir. 1990) (plain-view seizures are rarely truly inadvertent), and now also eliminate the inadvertence requirement.

Under *Horton,* for the plain-view doctrine to apply, the evidence must be in plain view, the officer must have a lawful right of access to the object itself, and the object's incriminating character must be immediately apparent. *Horton,* 496 U.S. at 136–37. To show that the incriminating character of an item was immediately apparent, police must show they had probable cause to believe the item in plain view was evidence or contraband. *Arizona v. Hicks,* 480 U.S. 321, 326–27 (1987).

These elements from *Horton* correspond to the criteria we have previously required for the plain-view doctrine to apply: (1) the evidence must be in plain view; (2) the officer must have a prior justification for being in the position from which she discovers the evidence in "plain view"; and (3) the evidence seized "in itself or in itself

with facts known to the officer at the time of the seizure, [must provide] probable cause to believe there is a connection between the evidence and criminal activity." *Washington,* 134 Wis. 2d at 121.

There is no issue as to the first two elements. Because Officer Zarse felt the bulge, the evidence was in "plain view." Because Zarse lawfully frisked the defendant, Zarse had a lawful right of access to the object when she felt the soft bulge. The only issue is whether the baggie's incriminating character was immediately apparent to Zarse.

The defendant argues that because Zarse said she felt something "soft" that could have been cocaine or marijuana, Zarse did not immediately know that the bulge was cocaine. The bag that Zarse pulled out contained "bindles" of cocaine, which would presumably have a certain feel. Zarse did not say that the soft bulge felt like bindles, but she did say that the bulge felt like "drugs . . . possibly cocaine or marijuana."

Zarse had found drugs in over 100 searches. That experience would help an officer know how drugs are stored and recognize the feel of a baggie containing bindles. Moreover, the fact that Zarse was executing a search warrant for drugs gave her an additional reason to believe that what she felt was drugs. We conclude that when Zarse felt the bulge, she immediately knew she had evidence at her fingertips. What she felt and what she knew at the time she felt it gave Zarse probable cause to believe there was a connection between the bulge and criminal activity. Accordingly, we hold that Zarse lawfully seized the cocaine when she reached into the defendant's pocket.

*By the Court.*—The decision of the court of appeals is reversed.

Justice DONALD W. STEINMETZ, took no part.

HEFFERNAN, CHIEF JUSTICE *(dissenting)*. I dissent from the majority opinion upholding Officer Zarse's frisk of Guy absent a particularized suspicion that Guy was armed and posed a danger to the police. The majority justifies its relaxed reading of the fourth amendment on the high incidence of drug related violence. While fully mindful of the enormity of the drug related problem that confronts this country's police officers, I nonetheless disagree with the majority's utter disregard for the state and federal constitutions' prohibition of unjustified governmental intrusions upon the rights of citizens.

The law of search and seizure is well documented in legal treatises and established case law, nevertheless, before proceeding with the facts of the instant dispute, I briefly recapitulate some of the law's most fundamental tenets. First, although the majority quotes Officer Zarse's statement that she was directed to frisk Guy for "contraband and weapons" (majority Op. at 91), the United States Supreme Court clearly distinguishes between the probable cause necessary to initiate a search for contraband and the reasonable suspicion needed to support a limited self-protective search for weapons.[1] Specifically, in *Ybarra v. Illinois,* the Court prohibited the police from searching the occupants of the premises for contraband absent probable cause that those objects named in the warrant were on the person of the occupant. *Ybarra v. Illinois,* 444 U.S. 85, 91 (1979).[2] I under-

---

[1] *See generally,* Wayne R. LaFave, SEARCH AND SEIZURE: A Treatise on the Fourth Amendment, 2d. ed., § 4.9 (c), (d) [hereinafter Search and Seizure].

[2] In his treatise, Professor LaFave notes that *Ybarra* was an "easy case" on its facts and that "when the warrant *is* for private

stand the majority opinion to address only the question of the appropriateness of Officer Zarse's search for weapons, even the state does not assert that probable cause existed to conduct a police search of Guy for concealed contraband. Hence we are confronted only with the question of the appropriateness of the initial *Terry* search.[3]

Second, the scope of a self-protective search is narrowly circumscribed under the rule set forth in *Terry v. Ohio*.[4] In order to initiate a search for weapons, the police officer executing the frisk must be able to articulate a suspicion that the person subject to frisk is armed and dangerous.[5] The Court has defined this standard to mean that an officer may undertake a protective frisk of an individual if the officer is "justified in believing that the individual whose suspicious behavior he is investi-

---

premises and the requisite notice is given prior to entry, it is fair to say that such a case does necessitate a somewhat different assessment than was permissible on the facts of *Ybarra*." Nevertheless, Professor LaFave continues, "this is not to suggest, contrary to *Ybarra*, that a search of the person for the property may be undertaken upon less than probable cause." *Id.* at 296–97.

[3] The court of appeals in the instant case, relying on *Ybarra*, correctly and succinctly stated, ". . . the frisk must be for *weapons*, not contraband." *Guy*, 165 Wis. 2d 333, 339.

[4] *Terry v. Ohio*, 392 U.S. 1 (1968). *See also Adams v. Williams*, 407 U.S. 143 (1972); *Michigan v. Long*, 463 U.S. 1032 (1983).

[5] In *Terry*, the majority stated a two-part test to determine whether the police officer acted within permissible, constitutional grounds for initiating the search: (1) whether the officer was rightfully in the presence of the party frisked; and (2) whether the officer suspected the party was armed and dangerous. In the case of a frisk undertaken pursuant to a warranted search, the first part of the *Terry* test is rendered superfluous. *See generally,* Search and Seizure at § 9.4(a).

gating at close range is armed and presently dangerous to the officer or to others . . .." *Terry v. Ohio,* 392 U.S. 1, 24 (1968). Commentators such as Professor LaFave suggest that a looser interpretation of "reasonable suspicion" for situations involving residential search warrants may be justified only because of the arguably heightened risks resulting from the lengthier, confined contact between the police officers and the persons present during the search.[6] Nevertheless, despite these arguably increased risks, the Court in *Ybarra v. Illinois* reaffirmed its earlier rulings prohibiting "a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." *Ybarra v. Illinois,* 444 U.S. at 94 (1979).

Neither the state nor the majority maintains that the police had particularized grounds for believing Guy to be "armed and dangerous" as required by *Terry.*[7] Indeed, Officer Zarse testified at the suppression hearing that "as she approached the defendant, the defendant

---

[6] *See* LaFave, Search and Seizure at § 4.9(d). Professor LaFave goes on to suggest that the risks attending a residential search might best be defused by having one police officer watch the suspects while fellow officers conduct the search. *Id.*

[7] In contrast, federal courts often require particularized suspicions before finding a "reasonable belief" that the suspect was armed and dangerous. *See e.g., United States v. Post,* 607 F.2d 847 (9th Cir. 1979) (DEA computer indicated suspect had history of narcotics trafficking); *U.S. v. Pajari,* 715 F.2d 1378 (8th Cir. 1983) (suspect bent down while sitting in the car as if to grab a weapon); *U.S. v. McNeal,* 955 F.2d 1067 (6th Cir. 1992) (suspect reached with his right hand toward his left armpit as if for a concealed weapon); *U.S. v. Rideau,* 969 F.2d 1572, 1575 (5th Cir. 1992) ("[w]hen approached and asked his name, [the suspect] did not respond but appeared nervous and, critically, backed away. . . . [as if] to give himself time and space to draw a weapon").

stood motionless and *did not appear to be armed.*" (majority Op. at 91, emphasis added.)[8] Furthermore, as stated in the opinion, the police officers present during the search outnumbered by a margin of at least two-to-one the occupants of the residence, all of whom were already handcuffed on the porch. Given these facts, even the state does not assert that the police officers executing the search warrant "reasonably believed" themselves to be endangered by Guy.

The majority recognizes the implausibility of its position and thus is obliged to broaden the *Terry* doctrine by ignoring the absence of particularized suspicion that Guy was armed and dangerous and relies instead on the generalized danger attending drug related searches. In support of its newly sanctioned policy authorizing a protective frisk of all persons found on the premises during the execution of a residential search warrant for cocaine, the majority asserts that one's presence at a place allegedly used in the drug trade is sufficient to raise a reasonable suspicion that the person is associated with

---

[8] The record indicates that Officer Zarse had no belief at all, let alone a reasonable or articulable belief, that Guy was armed. Officer Zarse executed the frisk because she was told to do so, not because she thought herself to be in danger. While the majority opinion in effect takes the position that had the judges who join in the opinion been in the place of Officer Zarse they could have reached an articulable and reasonable suspicion, based on the dubious legal proposition they now espouse, it is not the mental attitude that members of this court can now vicariously arrive at under their understanding of the facts—the reasonable suspicion must be that of the person at the scene. The record is clear that Officer Zarse had no suspicion, reasonable or not, articulable or not. The trial court made no finding that Officer Zarse had any suspicion whatsoever.

the alleged trafficking, and thus presumably armed and dangerous.[9]

The logic of the majority invokes a presumption that all persons living in areas infiltrated by drug traffickers could be considered armed and dangerous. The Fifth Circuit, however, recognized the dangers that inhere in this kind of inferential leap and cautioned that it would not endorse the "right to frisk anyone on the street at night in a high crime neighborhood." *United States v. Rideau,* 969 F.2d 1572, 1575 (5th Cir. 1992). To the contrary, the Fifth Circuit requires a particularized suspicion of the individual by police prior to executing a protective frisk.[10] In the instant dispute, the majority relies on case law from other jurisdictions to avoid the

---

[9] The majority begs the question by assuming, without any supporting facts whatsoever, that Guy was a drug dealer, albeit not a major one. There is no evidence of record that would support an inference that Guy was a dealer at all. We do not here have reason to dispute the majority's assertion that drug dealers, major or minor, should be treated alike, but the record is as bereft of any evidence, prior to the intrusions on her person, of prior drug dealing as it is of evidence that she was armed. The majority applies after-the-incident facts to justify an intrusion when there are no relevant prior facts. This is similar to stating, because a search revealed what was searched for, there was probable cause for the search even in the absence of any prior information or evidence. The fact is that prior to this event Guy was unknown to the police. The rationale that because she was not a "major" drug dealer she was a "minor" or insignificant drug dealer is fatuous.

[10] Indeed, the Fifth Circuit, in upholding the protective search of a person who happened to arrive at a suspected drug dealer's house during the execution of a search warrant, specifically noted that:

> [W]e do not countenance the search of any individual who happens to be no more than on the premises where a narcotics warrant is being executed. The mere presence of an individual on such premises

107

fact that this court, too, has universally required police to articulate a particularized suspicion of danger before frisking a suspect.

The majority mistakenly cites *State v. Williams* and *State v. Richardson* as examples of cases in which we found the violence associated with drug trafficking sufficient grounds for police to formulate a reasonable belief that they were in danger. (Majority Op. at 96.) However, in both cases, we considered the totality of the police officers' knowledge about the dangers posed by the particular individuals involved in the searches and concluded that "a person in possession of both firearms and large quantities of illegal drugs poses a significant threat to the safety of law enforcement officers . . .." *State v. Williams,* 168 Wis. 2d 970, 985, 485 N.W.2d 42 (1992). In *Williams,* the informant specifically told the police that the suspect drug trafficker possessed a gun and carried it with him. *Id.* at 977 (1992). Likewise, in *Richardson,* the police had information that the suspect subjected to the frisk had a prior drug related conviction. *State v. Richardson,* 156 Wis. 2d 128, 144, 456 N.W.2d 830 (1990).

In the instant case, the police had no knowledge that firearms or other weapons would be present at the scene of the search. Nor did the police have any information about Guy—let alone any information linking Guy to the alleged criminal violations. Instead, the police relied solely on Guy's presence at the suspect's home as grounds for believing her to be armed and dangerous. This is not a case in which the police frisked the suspected drug dealer named in the warrant; nor is it a case in which the police had any facts supporting a belief that

with nothing more does not suffice to justify a stop and frisk search under *Terry.*

*U.S. v. Harvey,* 897 F.2d 1300, 1304 n.2 (5th Cir. 1990).

Guy might be armed or involved in the suspect's drug trafficking—Guy just happened to be present at the home of "John Doe" during the execution of the search warrant.

Wisconsin courts have "rejected a blanket approach in narcotics cases . . .." *Williams, Id.* at 982 (citing *State v. Cleveland,* 118 Wis. 2d 615, 628, 348 N.W.2d 512 (1984)). In dissenting from the majority's holding, I do not dismiss the dangers confronting our cities' police officers. I cannot, however, accept the majority's willingness to attribute the incidents of violence surrounding drug transactions generally to all non-suspect individuals who are present at a drug raid. Despite Wisconsin's neighborhoods' increasing entanglement in the country's drug trade, this court must remain resolute in protecting against these "severe . . . intrusion[s] upon cherished personal security . . .." *Terry,* 392 U.S. at 24–25 (1968).

In view of my understanding of the facts and law in the instant dispute, I see no purpose for the majority to indulge in dicta as to whether the seizure of drugs made following Officer Zarse's illegal frisk of Guy was constitutional. Because the search itself was illegal any subsequent seizure must be suppressed. It is purposeless in the instant case to hypothesize that if the search had been legally undertaken the seizure would have been also. I dissent from the majority's opinion and would affirm the decision of the court of appeals.

I am authorized to state that JUSTICE SHIRLEY S. ABRAHAMSON joins in this dissent.