[No. AO24469. First Dist., Div. Three. Apr. 6, 1984.]

JULIO HORONTO SANTOS, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Sheldon Portman, Public Defender, Robert A. Weeks and F. Benjamin Rice, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

John K. Van de Kamp, Attorney General, Thomas A. Brady and Karl W. Payne, Deputy Attorneys General, for Real Party in Interest.

OPINION

**WHITE, P. J.**—This petition for writ of mandate and/or prohibition challenges a trial court ruling denying petitioner's motion to suppress evidence. (Pen. Code, § 1538.5.)

Two issues require our attention:

(1) Did the officers have sufficient grounds to detain petitioner when his two companions were seen passing objects in a closed-off parking lot at 10 p.m.?

(2) If the detention was proper, was pat search of petitioner justified by the circumstances?

Petitioner had been charged by information filed in Santa Clara County Superior Court with burglary (Pen. Code, § 459), receiving stolen property (Pen. Code, § 496), and possession of a dirk or dagger (Pen. Code, § 12020, subd. (a)). In superior court he moved to suppress evidence seized as a result of his detention by the police. The motion was based upon evidence presented at a de novo hearing held August 29, 1983. At the hearing, the court denied the motion to suppress. This petition followed.

STATEMENT OF FACTS

Officer Vincent Di Corti was patrolling with his partner, Officer Mike Maier, at 10 p.m. on Friday, May 27, 1983. In the area of Pomeroy and El Camino in Santa Clara he noticed three people standing in a parking lot, talking. His attention was attracted by the fact that they were in an area that was barricaded off with street barricades that indicated that that portion of the parking lot was closed to the public. Also, a man later identified as a Mr. Gervais was exchanging something from his wallet with an unidentified

man. Businesses were near the parking lot, but only a liquor store west of the cordoned off area was open at that time of the night. A different parking area was provided for the liquor store.

Officer Di Corti felt there was "some type of possible illegal activity going on between the passing of the item, whatever it was, and plus the fact that they were in the closed-off portion of the parking lot." He was aware of a municipal ordinance prohibiting loitering around closed businesses. As he approached the three individuals to make contact, they were leaving the parking lot. Petitioner and Mr. Gervais left in one direction, and the unidentified person, whom the officers did not stop, left in the opposite direction.

Officer Di Corti stopped Mr. Gervais while Officer Maier stopped petitioner. Officer Maier testified that he was working as a reserve police officer on the evening in question (his usual occupation is supervisor for an electronic firm). When he and Officer Di Corti contacted the two men, Officer Maier took petitioner off about ten feet from Officer Di Corti and began to talk to him and pat search him. Officer Maier first asked petitioner for identification and to explain what he was doing there. (The record does not reveal petitioner's answer.) He also pat searched him. At the hearing, he explained the reason for his pat search as follows:

"A. Standard procedure, officer's discretion and my training.

"Q. [by prosecutor]: Now, you said three items, standard procedure. Do you pat down everybody with whom you have contact on the street?

"A. No, Ma'am. Just when the situation dictates and using my own discretion as to the situation.

"Q. What was it about this situation that prompted you to do a pat-down search?

"A. The day of the week, Friday night, on El Camino, which has a problem with the cruisers. It was 10:00 o'clock in the evening. And suspected activity of the two subjects at the time of the stop.

"Q. What was, in your opinion, the suspected activity of the subjects?

"A. That is what we were trying to find out. They were talking suspiciously in the parking lot that was closed off and was closed off to all traffic, pedestrians and vehicles, and we were there to find out why.

"Q. Prior to pat searching Mr. Santos, had you received any identification from him?

"A. I do not recall. I don't think so. To correct that, yes, he did not have any identification on him as he told me.

"Q. Was it subsequent to that that you pat searched him?

"A. Right after he did tell me he had no identification I did a pat search.

"Q. Approximately how long after you first made contact with Mr. Santos did you pat search him, approximately, if you remember?

"A. Maybe two minutes at the very most."

During the pat-search, Officer Maier felt a hard object on petitioner's right lower back, stuck in his belt. It felt like it might be a knife handle or the handle of a small gun. He removed it, discovering that it was a double-edged knife in a sheath. After removing the knife, Officer Maier "finished the pat-down search, pulling a number of other objects out of his pockets and his coat." Petitioner had not yet been placed under arrest.

On cross-examination by petitioner's counsel, Officer Maier explained his actions a little further: "If you are familiar with the El Camino on Friday and Saturday nights, we have problems with cruisers, dealing with a large number of alcohol-related violations, drug-related violations, thefts, vandalism. The area was sectioned off from foot traffic and vehicle traffic at that one intersection." Officer Maier explained why he took other items from petitioner's pockets after finding the knife:

"Q. [by defense counsel]: Did you, during the course of the pat-down, after finding the knife, find anything else on patting him down that reasonably in your opinion appeared to be a weapon?

"A. That is why I pulled the objects out of his pockets.

"Q. Because they felt like weapons?

"A. They were questionable.

"Q. What did they feel like?

"A. That was what I was trying to find out.

"Q. But you didn't know?

"A. That is why I pulled them out to find out.

"Q. Can you tell me at this time how they felt, size, shape?

"A. Hard. Anything that I considered able to hold or conceal a weapon of any type.

"Q. Could you tell me what type of weapon, if anything in your experience, that you have seen in your experience, that they resembled or reminded you of?

"A. As far as resembling, cigarette lighters, but again lighters that can be turned up to high volume for one. Two any object that can conceal a razor blade that can be used, pen—sharpened tips on pens. Those are objects I have seen in my experience."

DISCUSSION

(1) Did the officers have sufficient grounds to detain petitioner when his two companions were seen passing objects in a closed-off parking lot at 10 p.m.?

Petitioner contends that the police officers did not have probable cause to arrest him for violation of the loitering statute because in the context of a penal statute "loiter" requires a sinister purpose for presence in a particular place. He argues that the observation of something being passed from Mr. Gervais to the unidentified person does not satisfy the requirement of a sinister purpose because the officers could not tell what that "something" was.

Real party correctly perceives that the initial question is not whether there was probable cause to arrest for loitering, but whether the observations of the officers justified a temporary detention for the purpose of investigation. Real party argues that the officers had sufficient grounds to suspect a violation of the loitering ordinance and were entitled to investigate.

■ "[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to

do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question." (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].)

■ By focusing on the question of probable cause to arrest, petitioner fails to present any theory for why the officers could not reasonably suspect criminal activity and detain petitioner to investigate. While an exchange of unidentified objects in a high narcotics area may not provide probable cause for arrest (see *Cunha v. Superior Court* (1970) 2 Cal.3d 352, 357 [85 Cal.Rptr. 160, 466 P.2d 704]; *Filitti v. Superior Court* (1972) 23 Cal.App.3d 930, 933-934 [100 Cal.Rptr. 583]), that activity and the possible violation of the municipal ordinance furnished grounds for detaining petitioner for questioning.[1] The more serious question is whether those observations plus petitioner's failure to produce identification add up to grounds for the further intrusion of a pat-search.

(2) If the detention was proper, was pat search of petitioner justified by the circumstances?

■ "The United States Supreme Court in *Terry v. Ohio* (1968) 392 U.S. 1, 27, . . . held that a police officer could undertake a pat-down search only 'where [the officer] has reason to believe that he is dealing with *an armed and dangerous individual.* . . . [T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' . . . The court proceeded further to say that 'in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inference which he is entitled to draw from the facts . . .' (*Id.*) In *People v. Superior Court (Simon)* (1972) 7 Cal.3d 186 . . . , we outlined the critical question as: '. . . is this the kind of confrontation in which the officer can reasonably believe in the possibility that a weapon may be used against him?' (7 Cal.3d at p. 204 [101 Cal.Rptr. 837, 496 P.2d 1205].)" (*People v. Lawler* (1973) 9 Cal.3d 156, 161 [107 Cal.Rptr. 13, 507 P.2d 621], italics in original.)

---

[1]Note that in dicta *Cunha v. Superior Court, supra,* 2 Cal.3d 352, 356, expressed doubt whether an officer could even detain persons seen exchanging objects for money in a high narcotics area. That dicta has been criticized by Justice Kaus in *People v. Handy* (1971) 16 Cal.App.3d 858, 862 [94 Cal.Rptr. 387], and has not been elevated to a binding ruling. Thus, it need not control here. In any case, the suspicion of violating a municipal ordinance by loitering in a closed parking lot for possibly criminal purposes would justify investigation even if the exchange of objects alone would not suffice.

Real party contends that the pat-search of petitioner was justified because "Officer Maier was alone with petitioner [Officer Di Corti was some ten feet away with Mr. Gervais], petitioner had no identification, petitioner may well have been involved in a drug transaction, and petitioner apparently had committed a violation of section 25.2.1." Curiously missing is any mention of the possibility petitioner might possess a weapon. Neither being alone with a police officer nor failing to possess identification signals that a person is armed and dangerous. Nor may a police officer assume that any person possibly engaged in a narcotics transaction or a municipal code violation is armed and dangerous. (Cf. *People* v. *Gastelo* (1967) 67 Cal.2d 586 [63 Cal.Rptr. 10, 432 P.2d 706]; *People* v. *DeSantiago* (1969) 71 Cal.2d 18 [76 Cal.Rptr. 809, 453 P.2d 353] [improper to assume anyone engaged in narcotics trafficking will destroy evidence when police knock at door].)

▪ Even were it permissible for a police officer to assume a person without identification and possibly engaged in a narcotics transaction was armed and dangerous, by Officer Maier's explanation, he did not pat search because he believed petitioner was armed. Rather, he searched because of "Standard procedure, officer's discretion and [his] training." He felt the situation dictated it because he had had problems in the area with cruisers and it was 10 p.m. on a Friday. He was not sure what the suspicious activity was, but he was "trying to find out" by pat searching petitioner. Significantly, even after removing the knife he continued to search petitioner because (apparently) he had not yet figured out what illegal activity was underway. He pulled a number of items from petitioner's pockets because he felt that any item that could conceal a razor blade, or any cigarette lighter, or any pen whose tip might be sharpened, was a potential weapon. When asked what the objects he removed felt like, all Officer Maier could answer was that "that was what [he] was trying to find out."

Real party asserts as a final justification for the pat search that Officer Maier "knew that he was going to have to spend additional time with and/or arrest petitioner." Aside from the problem that Officer Maier never articulated that ground for the pat search, there is no evidence a prolonged detention would have been permissible. Consider again what Officer Maier knew about petitioner: he was standing with two men in a closed off area of the parking lot; the two others exchanged something; petitioner had no identification. On what conceivable ground could Officer Maier have arrested petitioner or spent "additional time" with him? He could not have been arrested for loitering without a showing of any kind of criminality. ▪ "The word loitering as used in a criminal statute has a sinister or wrongful as well as a reasonable definite implication. As proscribed by such a statute it connotes lingering in the designated places for the purposes of committing a crime as opportunity may be discovered. It excludes the notion

of waiting for a lawful purpose. [Citations.]" (*People* v. *Caylor* (1970) 6 Cal.App.3d 51, 56 [85 Cal.Rptr. 497].) What criminality is there in standing near two persons who exchange an unidentified object? Clearly, Officer Maier could do no more than briefly detain petitioner unless he discovered incriminating evidence. The difficulty here is that it was only during the unlawful pat-search that he discovered such evidence.

Let a peremptory writ of mandate issue directing the Santa Clara Superior Court to vacate and set aside its order of August 29, 1983, denying petitioner's motion to suppress evidence seized from his person at the time of his detention, and to enter an order granting said motion.

Scott, J., and Feinberg, J., concurred.