STATE of Wisconsin, Plaintiff-Respondent,†

v.

Robin H. GUY, Defendant-Appellant.

Court of Appeals

*No. 91-0708-CR. Submitted on briefs September 3, 1991.—Decided October 29, 1991.*

(Also reported in 477 N.W.2d 349.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Elizabeth E. Stephens,* assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *James E. Doyle,* attorney general, and *Stephen W. Kleinmaier,* assistant attorney general.

Before Moser, P.J., Sullivan and Fine, JJ.

FINE, J. Robin Hitashi Guy appeals from her conviction of possession of cocaine with intent to deliver, in violation of sections 161.16(2)(b)1 and 161.41(1m)(c)1, Stats. She challenges the trial court's denial of her motion to suppress the cocaine.[1] The question presented by the appeal is whether law enforcement officers executing a validly issued search warrant may frisk a person on the premises for which the warrant was issued even though that person was not named in the warrant and the officers have no reasonable belief or suspicion that the person may be armed. We conclude that they may not. Accordingly, we reverse.

## I.

On August 23, 1990, police officers obtained a search warrant for a single-family house in Milwaukee. The warrant described the house as owned by " 'John Doe',b/m,31,5'9",145#" and authorized a search for cocaine, drug paraphernalia and related items as well as

[1]Guy pled guilty. A defendant may appeal from an order denying a motion to suppress evidence even though the judgment of conviction rests on a guilty plea. Section 971.31(10), Stats.

334

the "person of 'John Doe.' " Constance Zarse, one of the police officers who executed the warrant, testified that she first saw Guy on the porch, and that Guy, who was handcuffed at the time, did not appear to be carrying a weapon. Nevertheless, Zarse, at the direction of another officer, "patted [Guy] down," looking for, in her words, "contraband and weapons." During the frisk, Zarse "felt a bulge in [Guy's] left front pants pocket." Zarse testified that the bulge felt to her "like it was drugs . . . like a bag or—of possibly cocaine or marijuana." According to Zarse's testimony, she then asked Guy what was in the pocket, to which Guy, who was still in handcuffs, replied: "Find out for yourself." Zarse reached into Guy's pocket and discovered cocaine.[2]

As material to our inquiry, Guy's version of the pat-down was substantially similar to that related by Zarse. Guy testified that she was alone in the living room when the police officers entered the house. Guy's mother, brother, brother's father, and cousin were also in the house when the police arrived. Prior to the frisk and search, one or more officers told Guy to leave the living room, which she did. Guy testified that she walked on to the porch, and, when she attempted to step off the porch, she was called back and handcuffed.

Guy was not the first person Zarse had frisked while executing search warrants. Indeed, Zarse testified that during the course of her career as a police officer she had discovered evidence of drug possession on persons who were in places where a search warrant was being executed "over a hundred" times. She did not say, however, whether or not she had ever discovered weapons as the result of those frisks.

---

[2]The state does not argue that Guy consented to the search of her pocket.

Another police officer, James Boyd, a detective with the Milwaukee Police Department assigned to the narcotics unit of the Vice Control Division, testified that it was departmental policy for officers executing search warrants to frisk all persons who are on the premises being searched. He also testified that in the preceding two years he had helped to execute more than 300 to 400 search warrants in narcotics matters and that in "most cases" the officers had found weapons either at the place being searched or on the person of individuals present.

The trial court denied Guy's motion to suppress, ruling that the pat-down frisk was authorized by section 968.16, Stats., and was not constitutionally infirm. The trial court did not find, however, that Zarse reasonably believed or suspected that Guy may have been armed.

## II.

██ Section 968.16, Stats., provides:

**Detention and search of persons on premises.** The person executing the search warrant may reasonably detain and search any person on the premises at the time to protect himself from attack or to prevent the disposal or concealment of any item particularly described in the search warrant.

Zarse's frisk of Guy was clearly permitted by this provision since it permits a search for contraband. The question remains, however, whether the frisk passes muster under the Fourth Amendment to the United States Constitution.[3] This is a question of law that we must determine independently of the trial court's decision. *See*

---

[3]Guy does not argue that a different standard applies under Wisconsin's analogue to the Fourth Amendment, Article I, section 11 of the Wisconsin Constitution. The two provisions are

*State v. Murdock,* 155 Wis. 2d 217, 226, 455 N.W.2d 618, 621 (1990).

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Our analysis of the Fourth Amendment here begins with *Ybarra v. Illinois,* 444 U.S. 85 (1979).

*Ybarra* concerned an Illinois statute that, like section 968.16, Stats., authorized police officers executing a search warrant to search persons on the premises for which the warrant was issued.[4] The search warrant issued in *Ybarra* permitted police officers to search a

virtually identical. *See State v. Bruckner,* 151 Wis. 2d 833, 858, 447 N.W.2d 376, 387 (Ct. App. 1989).

If Zarse's frisk of Guy was lawful, the subsequent search would be lawful as well since Zarse felt something that she believed was either cocaine or marijuana. *See State v. Richardson,* 156 Wis. 2d 128, 145–150, 456 N.W.2d 830, 837–839 (1990) (lawful frisk for weapons gave officer probable cause to believe that defendant possessed contraband).

[4]The statute at issue in *Ybarra,* Ill. Rev. Stat., ch. 38, sec. 108-9 (1975), provided:

> In the execution of the warrant the person executing the same may reasonably detain to search any person in the place at the time:
>
> (a) To protect himself from attack, or
>
> (b) To prevent the disposal or concealment of any instruments, articles or things particularly described in the warrant.

*Ybarra,* 444 U.S. at 87, n.1.

tavern and the bartender, who was specifically named and described in the warrant, for heroin, money, and other evidence of narcotics possession. *Id.,* 444 U.S. at 88. Nine to thirteen patrons, including Ybarra, were in the tavern when the officers arrived with the warrant. *Ibid.* The officers announced that "they were going to conduct a 'cursory search for weapons,' " and one of the officers frisked the patrons while the tavern was being searched. *Ibid.* The pat-down of Ybarra revealed, according to a police officer's testimony, " 'a cigarette pack with objects in it.' " *Ibid.* The officer frisking the patrons did not immediately retrieve the cigarette pack from Ybarra but, rather, continued to frisk all of the other patrons first. *Ibid.* He then searched Ybarra a second time, and removed the cigarette pack from Ybarra's pants pocket. *Id.,* 444 U.S. at 89. Six tinfoil packets containing heroin were in the pack. *Ibid.* Ybarra was convicted of unlawful possession of a controlled substance. *Ibid.* The United States Supreme Court reversed, holding that the heroin was discovered as the result of an illegal search. *Id.,* 444 U.S. at 96.

In analyzing the Fourth Amendment issue presented by the officer's frisk and then search of Ybarra, the Court noted that the warrant did not authorize a search of anyone but the bartender, and, indeed, that the evidence presented to the magistrate who issued the warrant did not establish probable cause to search any person in the tavern other than the bartender. *Id.,* 444 U.S. at 90. Additionally, the officers executing the search warrant lacked probable cause to search Ybarra because they had no reason to believe that he was committing or was about to commit a crime. *Id.,* 444 U.S. at 91. Finally, and of special significance here, *Ybarra* rejected the state's contention that the officer's initial frisk of Ybarra was acceptable under the doctrine enun-

338

ciated in *Terry v. Ohio,* 392 U.S. 1 (1968), because the officers had no reason to believe that Ybarra was "armed and presently dangerous." *Ybarra,* 444 U.S. at 92–93. Thus, *Ybarra* noted:

> Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons" or, indeed, *any search whatever for anything but weapons.* The "narrow scope" of the *Terry* exception [to the requirement that a law enforcement officer must have probable cause to search a person] does not permit a frisk for weapons on less than *reasonable belief or suspicion* directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.

*Id.,* 444 U.S. at 93–94 (emphasis added).

*Terry* upheld the pat-down search of two men who were acting suspiciously. As a careful analysis of *Terry* makes clear, the level of "reasonable belief or suspicion," *Ybarra,* 444 U.S. at 94, need not be high before a law enforcement officer may frisk for weapons. What is also clear, however, is that—as the above quote from *Ybarra* indicates—the frisk must be for *weapons,* not contraband.

In *Terry,* Cleveland police officer Martin McFadden, testified that he spotted two men he had never seen before, John W. Terry and Richard Chilton, standing on a street corner. *Terry,* 392 U.S. at 5. McFadden's initial interest in the two men was aroused because, as McFadden testified at the suppression hearing, " 'when I looked over they didn't look right to me at the time.' " *Ibid.* McFadden then observed the men from a distance of 300 to 400 feet and saw each of them, alternatively, walk up and down the street five or six times. *Id.,* 392 U.S. at 5–6. On each trip, the men paused in front of a particular store and looked in the same window. *Id.,* 392 U.S. at 6.

At one point, Terry and Chilton were joined by a third man, with whom they briefly conferred before the man walked away and they continued their apparent surveillance of the store. *Ibid.* When Terry and Chilton left the area, McFadden followed. *Ibid.* He then saw the two men meet up with the third man in front of a store. At this point, McFadden, who suspected that the men were, in his words, " 'casing a job, a stick-up,' " approached them, identified himself as a police officer, and asked for their names. *Id.,* 392 U.S. at 6-7. When the men " 'mumbled something' in response," McFadden grabbed Terry, spun him around, and patted the outside of his clothing. *Id.,* 392 U.S. at 7. McFadden felt a pistol in the breast pocket of Terry's overcoat. *Ibid.*

The United States Supreme Court affirmed Terry's conviction for carrying a concealed weapon despite Terry's claim that McFadden's pat-down of him violated the Fourth Amendment. The Court held that the Fourth Amendment's protection against "unreasonable searches and seizures" required a balancing of the citizen's right "to be secure in [his] person[ ]," U.S. Const. amend. IV, on the one hand and, on the other hand, the governmental interest in the detection and prevention of crime, and in the safety of law enforcement personnel, *Terry,* 392 U.S. at 20-24. In resolving this natural tension between these competing values, *Terry* concluded that under the Fourth Amendment law enforcement officers have "a narrowly drawn authority" to "reasonabl[y] search for weapons" in order to assure the officer's protection where the officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.,* 392 U.S. at 27. Weighing the incredible potential for tragedy against the relatively minimal intrusion of a pat-down search, *see id.,* 392 U.S. at

29–30, the Court made it clear that this belief need not be terribly strong:

> The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.[5]

*Id.,* 392 U.S. at 27 (citations omitted). Again, however, the focus is on *safety* and the threat to that safety presented when law enforcement officers interact with armed persons. *Maryland v. Buie,* 494 U.S. 325, 110 S. Ct. 1093, 1099 n.3, 108 L. Ed. 2d 276, 287 n.3 (1990) (A *Terry*-type frisk is "permissible on less than probable cause only because [it is] limited to that which is necessary to protect the safety of officers and others."). We apply these principles here.

Appellate courts in Wisconsin have only once considered whether law enforcement officers executing a validly issued search warrant may frisk persons they encounter on the premises for which the warrant is issued. In *State v. Jeter,* 160 Wis. 2d 333, 466 N.W.2d 211 (Ct. App. 1991), the search warrant recited that at the designated premises "there is or are located certain

---

[5]*Terry* pointed out that in 1966, "[f]ifty-seven law enforcement officers were killed in the line of duty in this country." *Id.,* 392 U.S. at 24 n.21. Last year, sixty-five law enforcement officers in the United States were killed in the line of duty. Federal Bureau of Investigation, United States Department of Justice, *Uniform Crime Reports—Law Enforcement Officers Killed and Assaulted 1990* at 3.

person(s) or property which constitute evidence of, or were concerned in the commission of, the crime of possession of controlled substances." *Id.,* 160 Wis. 2d at 336 n.2, 466 N.W.2d at 213 n.2 (capitalization in original deleted). The warrant authorized the officers to effectuate a no-knock entry to the premises and to "search the above named person(s) or place(s) for the above named person(s) or property . . .." *Ibid.* No persons were otherwise identified, either by name or description. The court applied section 968.16, Stats., and, noting that the warrant had described an apparent drug house, *Jeter,* 160 Wis. 2d at 341, 466 N.W.2d at 215, held that the officers executing the warrant could, based on the specific language in the warrant, search persons on the premises for contraband, *id.,* 160 Wis. 2d at 340–341, 466 N.W.2d at 214–215.

In this case, unlike *Jeter,* the search warrant authorized a search of the premises and a person, designated as "John Doe," whose physical characteristics were described by the warrant. The warrant did not, however, authorize the search of Guy or anyone else on the premises other than "John Doe." Nevertheless, the state urges us to uphold the frisk because, as the state argues in its brief, "the pat down of the defendant [Guy] was reasonable to protect the safety of the officers." We are, however, bound by the appellate record, *see In Matter of Guardianship of Eberhardy,* 102 Wis. 2d 539, 571, 307 N.W.2d 881, 895–896 (1981), and the record does not support the state's contention.

As we have seen, although Officer Zarse testified that she frisked Guy looking "[f]or contraband and weapons," Guy, who was handcuffed at the time of the frisk, did not appear to Zarse to be armed. The *Terry*-type frisk must be for weapons, not contraband, and there must be a "reasonable belief or suspicion" that the

person to be frisked may be armed. *Ybarra,* 444 U.S. at 94. A "generalized 'cursory search for weapons' " is not permitted. *Id.,* 444 U.S. at 93–94. Thus, in *Buie,* which concerned the extent to which law enforcement officers executing a validly issued arrest warrant could conduct a "protective sweep" of the house in which the person named in the warrant was found, the Court rejected the State of Maryland's argument that "no level of objective justification should be required because of 'the danger that inheres in the in-home arrest for a violent crime.' " *Buie,* 494 U.S. at — n.2, 110 S. Ct. at 1098 n.2, 108 L. Ed. 2d at 286 n.2 (citation omitted). The Court reiterated that "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Ibid.*

The state attempts to distinguish *Ybarra* by noting that Ybarra was an innocent bystander in a public tavern while Guy was either a resident of—or, at the very least, a guest in—a private home. It is clear, however, that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313 (1972).[6] Accordingly, although the

---

[6]The Framers were undoubtedly aware of the famous 1763 speech in the British House of Commons attributed to William Pitt:

> The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!

*Miller v. United States,* 357 U.S. 301, 307 (1958). As Justice Robert H. Jackson wrote for the Court in *Johnson v. United States,* 333 U.S. 10, 14 (1948):

state is correct when it points out that, generally, persons present in private residences that are suspected drug houses are more likely to be armed than are persons who, like Ybarra, are accidently in public places for which search warrants have been issued, *see Jeter,* 160 Wis. 2d at 341, 466 N.W.2d at 215, that alone does not permit the invasion of interests so clearly protected by the Fourth Amendment, *see Buie,* 494 U.S. at — n.2, 110 S. Ct. at 1098 n.2, 108 L. Ed. 2d at 286 n.2. A *per se* rule that permitted officers searching a private residence to conduct a "generalized 'cursory search for weapons,' " *Ybarra,* 444 U.S. at 93–94, even though the officers did not reasonably believe or suspect that those being frisked may be armed, is not necessary to secure the officers' safety, and would thus strike at the very heart of the Fourth Amendment.

The state argues that several decisions by courts of other states support its contention that Guy's conviction should be affirmed. We disagree.

The lead case upon which the state relies is *People v. Thurman,* 209 Cal. App. 3d 817, 257 Cal. Rptr. 517 (1989). There, officers executing a search warrant in a private residence discovered Thurman sitting passively on a couch. *Id.,* 209 Cal App. 3d at 821, 257 Cal. Rptr. at 518. Although the warrant did not authorize the search of Thurman's person, an officer ordered Thurman to stand and, as testified to by the officer, the officer " 'immediately patted him down for weapons for

Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

safety.' " *Ibid.* The officer felt a large bulge that he believed was a gun in Thurman's pocket. *Ibid.* He then put his hand in Thurman's pocket and felt what he thought were " 'pieces of rock or rock cocaine in a baggie.' " *Ibid.* In upholding Thurman's conviction for possessing cocaine for sale, the Court of Appeals of California concluded, appropriately we believe, that under the circumstances of that case the officer acted lawfully in frisking Thurman:

> The officers whose duty required them to execute the warranted search were . . . well aware they were engaged in an undertaking fraught with the potential for sudden violence. They were necessarily cognizant of the very real threat that the occupants of the residence were within an environment where weapons are readily accessible and often hidden, nor could they discount the possibility that one or more of the individuals found inside were personally armed.

*Id.,* 209 Cal App. 3d at 823, 257 Cal. Rptr. at 520. In short, the court recognized that although Thurman appeared to be non-threatening, there was still the "potential for sudden armed violence," and that it would therefore be "utter folly" to require the "officer to await an overt act of hostility . . . before attempting to neutralize the threat of physical harm which accompanies an occupant's presence in a probable drug trafficking residential locale." *Ibid.* We agree. Significantly, however, the court distinguished the situation it faced in *Thurman* from an earlier court of appeals decision, *Santos v. Superior Court,* 154 Cal. App. 3d 1178, 202 Cal. Rptr. 6 (1984), where the court directed that the trial court grant a suppression motion because the *Terry*-type frisk was not based on the officer's belief that the suspect may have been armed. *Thurman,* 209 Cal. App. 3d

345

at 825, 257 Cal. Rptr. at 521. Instead, the officer was "not sure what the suspicious activity was, but he was 'trying to find out' by pat searching petitioner." *Santos,* 154 Cal. App. 3d at 1185, 202 Cal. Rptr. at 9.

The state also argues that *State v. Alamont,* 577 A.2d 665 (R.I. 1990), supports its position. There, one of the officers executing a search warrant for a residence discovered Alamont and another male in the kitchen standing with their hands on a sink at the direction of another officer. *Id.,* 557 A.2d at 666. The officer immediately frisked the two men for weapons even though they were being guarded by the other officer. *Ibid.* The officer frisking Alamont found a vial of crack cocaine, which the trial court suppressed. *Ibid.* In reversing, the Supreme Court of Rhode Island followed *Thurman* and concluded that the officer's immediate frisk of the two men was reasonable under the circumstances. *Id.,* 577 A.2d at 668–669. As the court pointed out, the other officer's presence did not "render unreasonable [the frisking officer]'s belief that [Alamont] could injure him". *Id.,* 557 A.2d at 668. (relying on *Michigan v. Long,* 463 U.S. 1032, 1051 (1983) (a *Terry* suspect under police control might be able to retrieve a weapon from his or her clothing)).

In *State v. Zearley,* 444 N.W.2d 353 (N.D. 1989), also relied upon by the state here, officers armed with a no-knock warrant were at the front door with the warrant while a drug enforcement agent, in plain clothes, knocked and walked into the house through the kitchen door. *Id.,* 444 N.W.2d at 354. The agent identified himself to a woman in the kitchen who, shouting " 'Jeff, the police are here to search the house,' " attempted to stop the agent from entering the hallway. *Ibid.* The agent walked into the hallway and encountered Jeffrey Zearley. *Id.,* 444 N.W.2d at 355. There was "a brief 'pushing

match,' " the agent identified himself and pushed Zearley against the wall. *Ibid.* When the other officers arrived, the agent frisked Zearley for weapons. *Ibid.* They found contraband, which the trial court suppressed. *Ibid.* The Supreme Court of North Dakota, following *Thurman,* held that, under the circumstances, the *Terry*-type frisk was reasonable. *Id.,* 444 N.W.2d at 356-357. The court did not, however, hold that law enforcement officers may always frisk persons found in residential premises being searched. To the contrary, the court reaffirmed the vitality of its earlier decision in *State v. Grant,* 361 N.W.2d 243 (N.D. 1985), which concluded that the search of a home-owner's purse was improper because it "was not based on a reasonable belief that she was armed." *Zearley,* 444 N.W.2d at 355.

In this case, unlike the situations in *Terry, Thurman, Alamont,* and *Zearley,* the appellate record does not support the state's contention that Officer Zarse reasonably believed or suspected that Guy was possibly armed; there was no "necessarily swift action predicated upon the on-the-spot observations of the officer," *Terry,* 392 U.S. at 20. Rather, Guy was allowed to leave the living room, and was on the porch and handcuffed before Zarse, who admitted that Guy did not appear to be armed, was directed by another officer to do the frisk. The fact that the officers may have previously discovered weapons on those present on residential premises during other searches at other places does not, by itself, justify the frisk of Guy here. Although an officer's prior experiences may, of course, be one element of his or her reasonable belief or suspicion that a particular person may be armed, *Terry,* 392 U.S. at 27, the officer must actually, and reasonably, hold that belief or suspicion. Again, "nothing in Terry can be understood to allow a

347

generalized 'cursory search for weapons.' " *Ybarra,* 444 U.S. at 93–94. Since there is no evidence here that Zarse reasonably believed or suspected that Guy may have been armed, the cocaine should have been suppressed.[7] *See Illinois v. Krull,* 480 U.S. 340, 347 (1987) ("When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure.").

*By the Court.*—Judgment reversed.

SULLIVAN, J. *(concurring).* To allay any concern that we dilute the vitality of *State v. Jeter,* 160 Wis. 2d 333, 466 N.W.2d 211 (Ct. App. 1991), I write this concurrence.

In *Jeter,* the search warrant authorized the search of a residence and stated with specificity the search of the following: "[I]n or on the . . . premises of 1101 IRVING PLACE . . . *there is or are located certain person(s)* or property which constitute evidence of, or were *concerned in the commission* of, the crime of POSSESSION OF CONTROLLED SUBSTANCES." *Id.* at 339, 466 N.W.2d at 214 (emphasis in original).

In this case, the warrant also authorized the search of a single-family residence but under a much more limited scope. The described person and objects of the search were: "cocaine, scales, packaging material, records of drug transactions, monies and/or fruits of the crimes, letters and/or utility bills and keys which would help to identify the person in control of the premises. Also, person of "John Doe" b/m, 31, 5'9", 145#."

---

[7]Since Guy was not arrested until after the cocaine was discovered, the search was not permitted as one incident to a lawful arrest. *Cf. Michigan v. Summers,* 452 U.S. 692, 695 (1981) (person lawfully arrested may be searched).

The *Jeter* search warrant authorized the search of a person or persons within the named residence. In this case, the warrant only authorized the search of an unknown black male resembling the description provided. Guy is a female. Moreover, immediately before her pat-down, she was in handcuffs and therefore appeared not to be an immediate threat to police. Her pat-down search for contraband and weapons exceeded the bounds of the warrant. Furthermore, the search of Guy did not meet the reasonable belief of "armed and dangerous" test enunciated in *Terry v. Ohio,* 392 U.S. 1, 27 (1968), nor was it a reasonable search under sec. 968.16, Stats. (detention and search of persons on premises). Unlike *Jeter,* neither the express terms of the warrant nor the circumstances at the time of the search justified a search of Guy.