[No. C055671. Third Dist. May 23, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL MICHAEL SANDOVAL, Defendant and Appellant.

## COUNSEL

Peggy A. Headley, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, John G. McLean and Doris A. Calandra, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, Acting P. J.**—On January 23, 2007, an information was filed in the Shasta County Superior Court charging defendant, Paul Michael Sandoval, with a violation of Health and Safety Code section 11377, subdivision (a) (possession of methamphetamine). Defendant was arraigned and pled not guilty.

On April 9, 2007, defendant filed a motion to suppress evidence pursuant to Penal Code section 1538.5. On April 25, 2007, the court denied the motion.

On May 7, 2007, defendant withdrew his not guilty plea and pled guilty to the violation of Health and Safety Code section 11377, subdivision (a). The court granted defendant probation.

On May 8, 2007, defendant filed a notice of appeal. On appeal, he challenges the denial of his motion to suppress.[1] For reasons that follow, we shall reverse the judgment.

## FACTS[2]

On December 7, 2006, Officer Shawn McGinnis was employed by the Redding Police Department and assigned to the Shasta Interagency Narcotics Task Force.

He had been a sworn peace officer for 20 years.

During his 20 years as a peace officer, Officer McGinnis had been involved with more than 500 narcotics cases.

Officer McGinnis had "been a party" to more than 75 search warrants at residences and "around a thousand" probation and parole searches on the street.

Officer McGinnis had also received training, in various courses, including a two-week narcotics investigation school conducted by POST (California Commission on Peace Officer Standards and Training). The officer also received formal and informal training "[i]n the area of officer safety."

When asked what specifically are the officer's concerns about persons at the scene of a residence, the officer testified: "The concern is always when you're dealing with a narcotics search at a residence is that someone may have a weapon to try to harm the entry team that's making entry into the residence. [¶] There's also a concern for weapons that may be concealed within that residence and there's the concern that people that are in the vicinity of the residence such as the front yard or back yard may be a threat to the team making entry into the residence to perform the search."

The officer testified further: "It's actually fairly common when we're performing probation or parole searches or search warrant services at residences that we come across a wide variety of weapons everything from knives, stun guns, firearms, Pepper Mace, baseball bats, I mean, there's a long list that we run across."

---

[1] The appeal lies. (Pen. Code, § 1538.5, subd. (m).)

[2] The facts are taken from the evidence adduced at the hearing on defendant's motion to suppress evidence.

The officer had conducted "thousands of pat downs for weapons over the past 20 years." The officer found a wide variety of weapons during his patdown searches.

On December 7, 2006, Officer McGinnis conducted a probation search of the residence of Shawn Funchess in the City of Redding. In the week before the search of Funchess's residence, two police officers had stopped several people coming and going to the residence with paraphernalia and drugs.

Prior to the search, Officer McGinnis was in charge of conducting a briefing session for other officers participating in the search. Part of the briefing involved discussion of a "safety plan" for the search. Part of the discussion of the "safety plan" for the search involved talking about "known associates" of the probationer—the target of the search. One of those individuals was defendant, Paul Michael Sandoval. Officer McGinnis knew from a prior search that defendant had resided with Shawn Funchess—the probationer. The officer knew defendant by sight.

The search team was comprised of seven officers. When the search team arrived at the Court Street address that was the object of the probation search, between 9:30 and 9:40 a.m., defendant was sitting on the top steps leading to the front porch of the residence smoking a cigarette. The officers had their guns drawn. Officer McGinnis immediately recognized defendant from prior contacts. The officer knew that defendant had been arrested several times in the last two years for possession of methamphetamine.

Defendant was sitting on the top step of the stairs leading to the residence, about four feet from the front door. The officers had defendant stand up, put his hands on his head, and turn around. Officer McGinnis handcuffed defendant. As this occurred, the "entry team" was going into the house.

After the "entry team" had made entry into the residence, and had "cleared the home," Officer McGinnis patted the outside of defendant's clothing to see if he could feel any weapons. The officer explained: "Whenever you have someone that's in close proximity to people that have weapons in their hands whether they be handguns or long guns there's the potential that the person could reach out and take a weapon, they could produce a weapon of their own to assault the entry team as they're conducting their approach to a house or an apartment. [¶] Basically from our perspective the safe thing to do is to have that person be handcuffed so that they're unable to reach any weapons they may have concealed on their person immediately."

Before conducting the patdown, the officer had no reason to believe defendant was armed or was committing a crime. In the briefing earlier in the day, it had not come up that defendant had been arrested for weapons possession. Nor was it disclosed defendant ever had a violent history.

In conducting the patdown, the officer "felt an object that was three or four inches tall and maybe about an inch wide and in the left pocket of his jacket." Thinking that the object might be a folding knife, the officer reached into the pocket and withdrew the object: a stun gun. With the knowledge that the stun gun was a weapon, the officer continued his patdown and seized some folded papers sticking out of an inside jacket pocket. The officer thought the papers could conceal an additional weapon such as a fixed-blade knife. When the officer pulled the papers out of the pocket, a small Ziploc baggie fell on the ground; it contained what appeared to be methamphetamine. The officer then found another Ziploc bag (containing what appeared to be methamphetamine) in defendant's left shirt pocket.

## DISCUSSION

Defendant contends the patdown search of defendant was unlawful.

Defendant argues, "The pat search was unlawful because there were not specific and articulable facts which reasonably supported an individualized suspicion that appellant was armed and dangerous." We agree with defendant.

The seminal test for the legality of a patdown search of a citizen on the street was announced by the United States Supreme Court in *Terry v. Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868] (*Terry*). In *Terry*, the high court held: "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (*Terry, supra*, 392 U.S. at p. 24 [20 L.Ed.2d at p. 908].)

The *Terry* court continued, "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." (*Terry, supra*, 392 U.S. at p. 27 [20 L.Ed.2d at p. 909].)

In 1979, the United States Supreme Court followed and applied *Terry* in *Ybarra v. Illinois* (1979) 444 U.S. 85 [62 L.Ed.2d 238, 100 S.Ct. 338] (*Ybarra*).

We quote a summary of the *Ybarra* case, 444 U.S. at page 85 [62 L.Ed.2d at pages 238–239]:

"SUMMARY

"Equipped with a search warrant authorizing them to search a tavern and the person of its bartender for evidence of narcotics possession, police officers entered the tavern, announced their purpose, and advised all those present that they intended to conduct a 'cursory search for weapons.' One officer proceeded to pat down each of the nine to thirteen tavern patrons, while the others searched the premises. In his initial pat down of a customer, the officer felt 'a cigarette pack with objects in it,' but did not remove the pack from the customer's pocket. After completing the pat down of the others, he returned to the customer a few minutes later, retrieved the pack, and discovered tinfoil packets containing heroin. After his indictment by an Illinois grand jury for the unlawful possession of a controlled substance, the customer filed a pretrial motion to suppress all the contraband that had been seized from his person. The Illinois trial court denied the motion to suppress, finding that the search had been conducted under the authority of an Illinois statute empowering officers, in executing a warrant, to detain and search any person found on the premises if necessary to either protect themselves from attack, or to prevent the disposal or concealment of anything particularly described in the warrant. After the customer was found guilty of possession of heroin, the Illinois Appellate Court affirmed his conviction, determining that the state statute was not unconstitutional in its application to the facts of the case ([*People v. Ybarra* (1978)] 58 Ill App 3d 57, 373 NE2d 1013).

"On appeal, the United States Supreme Court reversed and remanded. In an opinion by STEWART, J., joined by BRENNAN, WHITE, MARSHALL, POWELL and STEVENS, JJ., it was held that the searches and resultant seizure contravened the Fourth and Fourteenth Amendments, since (1) no probable cause existed at the time the search warrant was issued for the authorities to believe that any person found in the tavern other than the bartender would be violating the law, (2) regardless of the fact that police possessed a warrant based on probable cause to search the tavern, there was no such probable cause to search the patron at the time the warrant was executed, the police having no reason to believe that he had committed, was committing, or was about to commit any state or federal offense, (3) each customer in the tavern was clothed with an individualized protection against an unreasonable search or seizure which was separate and distinct from the

Fourth and Fourteenth Amendment protection possessed by the proprietor of the tavern or by the bartender, the warrant which provided the officers with authority to search the premises giving them no authority to invade the constitutional protection possessed individually by tavern customers, and (4) the initial pat down of the customer was not supported by a reasonable belief that he was armed, was not therefore a permissible exception to the requirement of probable cause, and accordingly could not yield probable cause to support the second, more extensive search, allegedly based on an exigent situation, during which the heroin was found.

"BURGER, Ch. J., joined by BLACKMUN and REHNQUIST, JJ., dissenting, expressed the view that a particularized and individualized suspicion that a person is armed and dangerous is not necessary to render a pat down search constitutional, and that when police execute a search warrant in a place of known narcotics activity, they may protect themselves by conducting such a search.

"REHNQUIST, joined by BURGER, Ch. J., and BLACKMUN, J., dissenting, expressed the view that the police officer, acting under the authority of a valid search warrant, did not exceed the reasonable scope of that warrant in locating and retrieving the heroin secreted in the customer's pocket."

The majority opinion in *Ybarra*, by Justice Stewart, rejects the state's argument that the initial patdown search of Ybarra was lawful under *Terry, supra*, 392 U.S. 1 [20 L.Ed.2d 889] as follows:

"Notwithstanding the absence of probable cause to search Ybarra, the State argues that the action of the police in searching him and seizing what was found in his pocket was nonetheless constitutionally permissible. We are asked to find that the first patdown search of Ybarra constituted a reasonable frisk for weapons under the doctrine of *Terry* v. *Ohio*, 392 U.S. 1 [20 L.Ed.2d 889]. If this finding is made, it is then possible to conclude, the State argues, that the second search of Ybarra was constitutionally justified. The argument is that the patdown yielded probable cause to believe that Ybarra was carrying narcotics, and that this probable cause constitutionally supported the second search, no warrant being required in light of the exigencies of the situation coupled with the ease with which Ybarra could have disposed of the illegal substance.

"We are unable to take even the first step required by this argument. *The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons. Adams* v. *Williams,* 407 U.S. 143, 146 [32 L.Ed.2d 612, 92 S.Ct. 1921]; *Terry* v. *Ohio, supra,* [392 U.S.] at [pp.] 21–24, 27 [20 L.Ed.2d 889]." (*Ybarra, supra,* 444 U.S. at pp. 92–93 [62 L.Ed.2d at p. 246], fn. omitted, italics added.)

■ The *Ybarra* opinion continues: "The *Terry* case created an exception to the requirement of probable cause, an exception whose 'narrow scope' this Court 'has been careful to maintain.' Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. See, *e. g., Adams* v. *Williams, supra*[, 407 U.S. 143] (at night, in high-crime district, lone police officer approached person believed by officer to possess gun and narcotics). Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons. The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." (*Ybarra, supra,* 444 U.S. at pp. 93–94 [62 L.Ed.2d at p. 247], fn. omitted.)

■ In the present case, the patdown search of defendant Sandoval was unlawful under *Terry* and *Ybarra*. The officer conducting the patdown search, Officer McGinnis, did not testify he thought defendant was armed and dangerous. To the contrary, the officer testified he did not suspect defendant was engaged in criminal activity and the officer had no reason to believe defendant was armed. The fact that defendant was located in front of a house where narcotics were thought to be is insufficient, in and of itself, to justify a patdown search under *Ybarra*. (*Ybarra, supra,* 444 U.S. at p. 94 [62 L.Ed.2d at p. 247].)

At oral argument, the Attorney General contended *Ybarra* was distinguishable because there the police had no prior contact with the bar customer who was patted down, whereas here, Officer McGinnis had had prior contact with defendant. However, these prior contacts did not cause the officer, who was a 20-year veteran of the force, to believe or suspect that defendant was armed or dangerous. We are unable to distinguish *Ybarra* from the present case on this basis, or on any other, for that matter.

*Terry* and *Ybarra* still state good law in the Supreme Court of the United States. (See *Minnesota v. Dickerson* (1993) 508 U.S. 366, 373 & fn. 4 [124 L.Ed.2d 334 & fn. 4, 113 S.Ct. 2130]; *Illinois v. Wardlow* (2000) 528 U.S. 119, 123 [145 L.Ed.2d 570, 120 S.Ct. 673]; *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.* (2004) 542 U.S. 177, 185–189 [159 L.Ed.2d 292, 124 S.Ct. 2451].)

The trial court relied on two cases from the California Court of Appeal: *People v. Thurman* (1989) 209 Cal.App.3d 817 [257 Cal.Rptr. 517] (*Thurman*) and *People v. Huerta* (1990) 218 Cal.App.3d 744 [267 Cal.Rptr. 243]. So do the People on appeal. Both cases upheld patdown searches of citizens who were present in residences which were being lawfully searched for drugs by the police. However, in neither case did an officer testify he had no reason to believe the defendant was armed. To the contrary, in *Thurman*, the Court of Appeal found the officers could not "discount the possibility that one or more of the individuals found inside were personally armed." (*Thurman, supra,* 209 Cal.App.3d at p. 823.) At another point, *Thurman* comments, "Appellant's reliance on *Santos v. Superior Court* (1984) 154 Cal.App.3d 1178 [202 Cal.Rptr. 6] is also misdirected for in *Santos,* unlike the case before us, the patdown search conducted by the police officer was not based on the officer's belief that the defendant was armed and dangerous." (*Thurman, supra,* 209 Cal.App.3d at p. 825.)

The touchstone for justifying a patdown search under *Terry* and *Ybarra* is that the officer must have a reasonable belief or suspicion that the suspect is armed. Here, Officer McGinnis had no such belief or suspicion. The patdown search was therefore unlawful under *Terry* and *Ybarra.* If the holdings of *Terry* and *Ybarra* are to be enlarged so as to justify patdown searches of all citizens present when a residence is searched for drugs, it is for the United States Supreme Court, not this court, to do so.

Because we resolve the case in this way, we have no occasion to decide whether the patdown search was also unlawful because defendant was handcuffed when the search was conducted.

## DISPOSITION

The judgment is reversed.

Nicholson, J., and Hull, J., concurred.

A petition for a rehearing was denied June 13, 2008, and respondent's petition for review by the Supreme Court was denied August 27, 2008, S164778. Baxter, J., was of the opinion that the petition should be granted.