# COURT OF APPEALS
# DECISION
# DATED AND FILED

## February 11, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* **WIS. STAT. § 808.10 and RULE 809.62.**

**Appeal No.** **2024AP2543-CR**

**STATE OF WISCONSIN**

**Cir. Ct. No. 2023CF366**

**IN COURT OF APPEALS
DISTRICT II**

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

SIR GRANT,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Waukesha County: PAUL BUGENHAGEN, JR., Judge. *Affirmed*.

Before Gundrum, Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Sir Grant challenges his judgment of conviction entered upon his no contest plea to possession of cocaine with intent to deliver and his guilty plea to possession of a firearm by a felon. He contends the circuit court erred in denying his motion to suppress evidence obtained as a result of a pat-down search conducted during a traffic stop. For the following reasons, we conclude the court did not err, and we affirm.

## BACKGROUND

¶2 At the evidentiary hearing on Grant's suppression motion, the following relevant evidence was presented.

¶3 A City of Waukesha police officer agreed that he had received training "in detecting individuals who may be involved in drug sales or drug purchases" and had gained experience in stopping cars that he "suspected of being engaged in drug deliveries or drug purchases." On March 4, 2023, at approximately 11:19 p.m., the officer was conducting surveillance of the area around the parking lot of a particular apartment building, which was an area of significant drug activity. The officer explained:

> Based on prior information and observation from other fellow officers, we believed this area was a known drug area, as well as the house in specific to be a known drug house with frequent drug activities.
>
> ….
>
> … Based on other officers' observations there w[as] traffic that was being monitored that would be consistent with drug activity on prior dates.
>
> ....
>
> … [Specifically, there were] short-term contacts as well as people that don't live there coming in and out of the

> buildings or other subjects loitering within parking lots and having short-term contacts in the parking lots as well.
>
> ….
>
> … [Other officers] previously have seen short-term contacts within the parking lot as well as short-term contacts of subjects going in and out very quickly of the apartment building.

The officer further explained that based on his training and experience, "a short-term contact would be indicative of drug activity or drug sales." When asked if he himself previously had conducted a traffic stop following observation of such a short-term vehicular contact and discovered in the suspect vehicle "either drugs or money that could have come from a drug sale," he confirmed that he had.

¶4     At the time he was conducting surveillance of the area around the parking lot, the officer observed a vehicle that "was continuously running … ma[k]e a short-term contact with another subject." After the vehicle quickly exited the parking lot, the officer followed it and, after determining it was speeding, performed a traffic stop.

¶5     The officer explained to the circuit court the correlation he has observed between illegal drugs and the presence of weapons, stating that persons who "carry [illegal] narcotics as well as money … are found to carry firearms or other weapons for not only their … personal protection, but for the protection of their drugs as well as the monies from the proceeds of the drugs." The officer further added that he had been involved in "probably over 10" drug investigations related to a traffic stop "in which the person had drugs and a firearm on their person or in their vehicle."

¶6     The officer testified that upon approaching the vehicle, he knocked on the back passenger-side window and asked the driver, Grant, to roll down the

windows. He initially did not do so, and when he finally did roll the windows down, "he only rolled [them] down … about 2 or 3 inches." When asked if this was "normal" or "unusual," the officer stated it was unusual, adding that "[t]he vast majority of people who are stopped by police roll their windows all the way down … without asking." This raised concerns for the officer because based upon his training and experience, "those that only roll their windows down a short amount, about approximately 2 to 3 inches, they are doing that for a reason, for either concealing or trying to hide smells," which can include the smell of drugs, "or trying to have an evasive contact with the police." The officer asked Grant for his driver's license or identification card, and Grant "took an excessive amount of time" to provide his license and, in fact, failed to do so before exiting the vehicle.

¶7      A backup officer approached the vehicle on the driver's side, and the first officer noticed that Grant "was very fixated on my partner['s] position as well as what we were doing." The first officer asked Grant "multiple times to speak with me and only to me." The officer observed Grant to be "very nervous," with his hands shaking and "looking around him, trying to be very fixated on my position outside the vehicle as well as my partner's position, kept asking questions, felt that he was unsafe and overall[,] just very uncooperative, which is not normal for a routine traffic stop." Noting that he had performed thousands of traffic stops during his law enforcement career, the officer agreed that Grant's level of nervousness was unusual for a normal traffic stop. Reiterating the various observations he had made of Grant, the officer explained that these factors raised concerns about his and the other officer's security.

¶8      After asking Grant multiple times to provide his driver's license and Grant failing to do so, the officer asked him to step out of the vehicle. Grant initially did not do so, and the officer had to ask him "numerous, numerous times" before he

finally exited the vehicle. Grant continued exhibiting nervousness upon exiting the vehicle. Concerned about Grant's behavior and the fact that they were "in close contact with" him, "an unknown person," the officers conducted a pat-down search of Grant for weapons. They did so because they feared "he may be possibly involved in narcotics or drug sales[ and] that he would possibly be armed." During the pat down, the officer located in Grant's waistband a "fully loaded semiautomatic pistol" with a round chambered.

¶9 On cross-examination, the officer acknowledged he had not "personally observe[d] any actual drug transaction or any drug use that night in th[e] parking lot" nor smelled any suspicious odors emanating from the vehicle, even when his face was "pretty close to [the two to three inch] opening in the window." The officer quantified that it took Grant "between 10 and 20" seconds to find his driver's license when asked for it and agreed Grant handed it to the officer after exiting the vehicle. The officer acknowledged that prior to exiting the vehicle, Grant had expressed he felt "unsafe."

¶10 After specifically finding the testifying officer credible, the circuit court denied the suppression motion. Thereafter, Grant pled guilty to felon in possession of a firearm, and in relation to other evidence discovered, pled no contest to possession of cocaine with intent to deliver with use of a dangerous weapon, with charges of maintaining a drug trafficking place with use of a dangerous weapon, possession of drug paraphernalia, and possession of an electronic weapon being dismissed and read in. Following his sentencing, Grant initiated this appeal, challenging the officer's decision to conduct the pat-down search.

**DISCUSSION**

¶11    Grant contends the circuit court erred in determining the officer had the reasonable suspicion necessary to lawfully conduct the pat-down search. We conclude the court did not err.

¶12    "When we review a circuit court's ruling on a motion to suppress evidence, we apply the clearly erroneous standard to the circuit court's findings of fact. However, we review the circuit court's application of constitutional principles to the findings of fact de novo." *State v. Smiter*, 2011 WI App 15, ¶9, 331 Wis. 2d 431, 793 N.W.2d 920 (2010) (citation omitted).

¶13    A police officer's pat-down search for weapons is reasonable, and thus constitutional, if the officer's suspicion that the person "*may* be armed and dangerous" is objectively reasonable under the totality of the circumstances and in light of the officer's training and experience. *State v. Nesbit*, 2017 WI App 58, ¶6, 378 Wis. 2d 65, 902 N.W.2d 266 (emphasis added; citation omitted) ("A protective frisk to search for weapons is considered reasonable under the Fourth Amendment if it is supported by 'reasonable suspicion that a person may be armed and dangerous to the officer or others.'" (citation omitted)); *State v. Waldner*, 206 Wis. 2d 51, 56, 556 N.W.2d 681 (1996); *State v. Guy*, 172 Wis. 2d 86, 96, 492 N.W.2d 311 (1992) ("Officers can draw reasonable inferences from the facts in light of their experience."). The circuit court correctly determined that the officer's decision to pat down Grant met that standard.

¶14    Based on observations of his fellow officers, the area where the officer was conducting surveillance was a "known drug area" and the specific apartment building was "a known drug house with frequent drug activities." The officer detailed the prior observations of fellow officers that led to this conclusion,

specifically "subjects loitering within parking lots" and "short-term contacts within the parking lot as well as short-term contacts of subjects going in and out very quickly of the apartment building." When asked, the officer confirmed he personally had received training "in detecting individuals who may be involved in drug sales or drug purchases" and had gained experience in stopping cars "suspected of being engaged in drug deliveries or drug purchases." The officer also agreed he personally had experience with conducting a traffic stop following observation of a short-term vehicular contact, like the contacts previously observed at this area by fellow officers, and had learned that the vehicle he stopped did in fact contain "drugs or money that could have come from a drug sale."

¶15 In this case, the officer observed Grant's vehicle to be continuously running in the parking lot when another subject made a short-term contact with it. Moments later, the officer stopped Grant for speeding. When the officer asked him to roll down the windows, he initially did not do so, and when he eventually did roll down the windows, he rolled them down only two to three inches. The officer found this "unusual" as "[t]he vast majority of people who are stopped by police roll their windows all the way down … without asking." Not only did Grant's resistance to rolling down his window indicate a lack of cooperation, it further suggested an attempt by him to be evasive and limit the extent to which the officer would be able to make observations as to the inside of the vehicle.

¶16 The officer also testified that Grant took an abnormally long time to provide his driver's license[1] and did not readily exit his vehicle when requested "numerous, numerous times," indicating further resistance and a lack of cooperation. Additionally, the officer stated that he had performed thousands of traffic stops, and based on his experience, Grant's level of nervousness was excessive for a routine traffic stop,[2] further suggesting Grant was concerned officers would discover something illegal.

---

[1] Grant contends the circuit court's finding that he "did not get his license out right away" is "clearly erroneous, as [the video] reflects that Mr. Grant did produce [his license] while in the vehicle." Grant maintains that when the officer asked him, "Do you have a driver's license or ID card on you?," he was not asking Grant to "produce it or hand it over." This defies common sense. By asking if Grant had a license or ID card on him, the officer was clearly communicating to Grant to produce his driver's license or ID card if he had one. Moreover, as the State points out, even after the officer repeated himself, "Grant took his time retrieving his driver's license from his wallet, held it in his hand for some time, and never even offered it to either officer until the officers opened his doors to remove him from his vehicle."

[2] As indicated, the circuit court found the officer's testimony credible, and it also stated that it had watched the video and found that it "corroborated what the officer testified to." Based upon the presented evidence, the court found that Grant's hands were shaking and he "appeared nervous."

Relying on the recording from the officer's body camera, Grant challenges the circuit court's finding that Grant's "hands were shaking." He maintains that "[a]t no time does the video reflect that Mr. Grant's hands were shaking." We cannot say from our own review of the video that the court clearly erred in its factual finding that Grant's hands were shaking. *See State v. Walli*, 2011 WI App 86, ¶17, 334 Wis. 2d 402, 799 N.W.2d 898 ("[W]hen evidence in the record consists of disputed testimony and a video recording, we will apply the clearly erroneous standard of review when we are reviewing the … court's findings of fact based on that recording.")

To begin, the video does not show Grant's hands at all times during which it appears the officer would have been in a position to personally view his hands. Thus, the officer may have observed Grant's hands shaking (as he testified) at a time when the video simply does not show his hands at all. Additionally, the quality of the video is not so crisp as to allow us to confidently conclude that his hands were not shaking even during the times they are visible in the video. And lastly, we note that at one point during the two officers' engagement with Grant before removing him from the vehicle, one of the officers (it appears to be the second officer, who is in closest physical proximity to Grant) explains to Grant that one of the reasons he wants Grant to step out of the car is that Grant is "very shaky." In the video, Grant makes no response to the officer that in any way suggests he does not agree with the officer's assessment in this regard.

¶17    The officer explained that he has observed a correlation between illegal drugs and the presence of firearms, stating that persons who "carry [illegal] narcotics as well as money … also are found to carry firearms or other weapons for not only their … personal protection, but for the protection of their drugs as well as the monies from the proceeds of the drugs."  The officer added that he had been personally involved in "probably over 10" traffic-stop drug investigations "in which the person had drugs and a firearm on their person or in their vehicle."  The officer's own experience correlates strongly with a long-held recognition of our supreme court, that "weapons are often 'tools of the trade' for drug dealers," *Guy*, 172 Wis. 2d at 96, and "[t]he violence associated with drug trafficking … places law enforcement officers in extreme danger," *State v. Williams*, 168 Wis. 2d 970, 984, 485 N.W.2d 42 (1992), *overruled on other grounds by State v. Stevens*, 181 Wis. 2d 410, 511 N.W.2d 591 (1994).  Our supreme court has further noted that "[s]everal cases have found that drug dealers and weapons go hand in hand, thus warranting a *Terry*[3] frisk for weapons."  *State v. Richardson*, 156 Wis. 2d 128, 144, 456 N.W.2d 830 (1990).  Indeed, in *Guy*, the court even "assume[d]" that the officer in that case, who was executing a search warrant for cocaine, "knew that those who deal drugs often keep weapons on their person or nearby."  *Guy*, 172 Wis. 2d at 96.

¶18    In light of the totality of the circumstances, Grant having brief contact in the parking lot of a known drug area, his lack of cooperation with law enforcement, unusual nervousness for a routine traffic stop, and appearance that he had something to hide, including rolling down the windows only a few inches and resistance to providing his driver's license, the officer had reasonable suspicion Grant had just been involved in an illegal drug transaction.  The officer's related

---

[3]  *Terry v. Ohio*, 392 U.S. 1 (1968).

9

concerns for his safety and that of the other officer were likewise reasonable, because, as our supreme court has noted and this officer had personally experienced, drug dealing and weapons "go hand in hand." *See **Richardson***, 156 Wis. 2d at 144. And Grant's demonstrated lack of cooperation raised the specter that he may continue to display his lack of cooperation, perhaps by utilizing a weapon. The circuit court did not err in concluding that the officer had reasonable suspicion that Grant may have been armed and dangerous, thereby justifying the brief pat-down search.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5 (2023-24).